## THE STATE *v.* LEONARD COLLINS HORNSBY.

To entitle the prisoner to a new trial in a criminal prosecution, on the ground of evidence having been discovered since the trial, the newly discovered evidence must be such as would probably produce a different verdict.

The omission, in an indictment for murder, of one or more letters in a word, which does not change the word into another of a different signification, will not vitiate the indictment; nor will it be fatal under the 15th sect. of the 6th art. of the constitution, which requires all judicial proceedings to be conducted in the language of the constitution, that such omission changes the word to a French term of the same meaning as that intended to be used, as where the indictment charges that the mortal blow caused " an *extravasion* (for extravasation) of blood, &c."

The omission, in an indictment for murder, of one or more letters in a word, where the whole word might be rejected as surplusage, is immaterial.

It is unnecessary in an indictment for murder to state the length, breadth, or depth of the wound. The term mortal is indispensable in describing the wound or bruise, but when so described and adequate cause of death is assigned, which will be supported by evidence of any deadly wound or bruise, it has never been required to prove either a wound or bruise as laid.

In capital cases a jury should not be permitted to separate, after they have been sworn, whether the prisoner consent or not. In cases not capital, courts may, in their discretion, permit the jury to separate, before they have received the charge of the court, but not after the charge has been given. In cases not capital, misconduct on the part of the jury, where they have been permitted to separate, will cause their verdict to be set aside; in capital cases, where they have separated, misconduct and abuse will always be presumed, and a new trial ordered.

Sect. 18. art. 6 of the constitution, having provided that, " in all criminal prosecutions the accused shall have the right of meeting the witnesses face to face and of having compulsory process for obtaining witnesses in his favor," the failure of the Legislature to invest the courts of original criminal jurisdiction with power to coerce the attendance of witnesses residing within the State beyond the limits of their respective territorial jurisdictions, cannot deprive the accused of his right, under the constitution, of having his witnesses heard, whether found within or beyond such limits; and as he is entitled to a speedy trial, (Const. art. 6, s. 18,) and as the right of being confronted with the witnesses against him is a personal privilege which the accused may waive, he may require the testimony of witnesses in his favor, residing within the State but beyond the jurisdiction of the court, to be taken under commission.

APPEAL from the Criminal Court of the First District, *Canonge*, J.

*Preston*, Attorney General, for the State. The indictment is

not affected by mis-spelling. 2 Taunt. 401. 4 Comyn's Dig. 664, note. Hawkins P. C. 233. 1 Chitty, 139, 141, 142, 167, 196, 197. Jacob's Law Dict. (Tomlin's ed.) *verbo*, Indictment, No. III. 3 Black. Comm. 409, 410. Strange, 889. As to the sufficiency of the description of the wound, see 6 Com. Law Cases, p. 21. 7 Ibid. 101. 3 Chitty, 736. Leach, 569. 1 Russell & M. C. C. 5. 1 Russ. & Ry. 345, 358. 12 Peters-dorff's Abridg. 725. *State* v. *McCoy and others, ante*, 545. Archbold's Evid. 385. The separation of a jury is not a ground for a motion in arrest of judgment, and a new trial was not moved for on that account. In England in early times, juries in criminal cases were kept together on bread and water; but this was only after the evidence was closed, the jury charged, and the case committed to them. See 4 Black, 354, 360, and *note.* This strictness has been relaxed in modern times. See the case of *Fries*, 3 Dallas, 515. 2 Sumner, 81, 82, 83. *State of Ohio* v. *Dougherty*, West. Law Journal, No. 6, p. 271. *Wilson* v. *Abrahams*, 1 Hill, 207. 12 Pickering, 519. 2 Wendell, 353. 3 Johns. 255. *Smith* v. *Thompson*, 1 Cowen, 221. 2 Hale's P. C. 193, 296.

*Collens*, for the appellant, as to the questions arising out of the motion for a new trial, cited 4 Black. 119, 192, 199, 201. 1 Russell, 604. East, 273. 1 Chitty, 611, 612. 2 Russell, 210. 1 Wheeler, 28. On the motion in arrest of judgment, he cited Const. art. 6, s. 18. Hawkins, 329, ch. 25, ss. 87, 88. 3 Chitty, 734, 735. 1 East, 343. 2 Hawk. ch. 23, s. 80; ch. 25, s. 57. Haywood's N. C. Rep. 140. Archbold, ed. 1824, p. 212; new ed. p. 317. 1 Chitty, 628. 6 Durn. & East, 530. Roscoe, 177, 178. 7 State Trials, 419. 13 Mass. 218. 5 Cowen, 283. Graham on New Trials, 91. McLeod's Trial, p. 16.

*Preaux* and *Soulé*, on the same side.

NICHOLLS, J. An appeal has been taken from the judgment of the Criminal Court of New Orleans, pronounced upon the verdict of the jury, who found the accused guilty of manslaughter. A motion for a new trial, and also a motion in arrest of judgment, were both made in the inferior court, by the prisoner, and overruled. The correctness of the opinion of the court, *a qua*, upon these two motions, forms the subject of this appeal. A new trial was urged, upon two grounds: 1st. Because the verdict was contrary to law and evidence—2d. On account of the discovery of new testimony since the trial. The judgment was sought to be arrested, on the following grounds: "1st. That the indictment is not wholly in the English language, as required by the laws and constitution of the State, and said indictment is wholly unmeaning, void and illegal." 2d. "That there is no intelligible or sufficient description of the means of death, or any mortal

wound or blow. 3d. That the length and breadth of the wound alleged to have been mortal is not set forth in the indictment, as required by law, nor does it in any other manner appear from the indictment, that the wound given was sufficient to cause the death. 4th. That during the adjournment of the court from day to day, and while the trial was proceeding, the jury was allowed repeatedly to separate and go to their homes and business, instead of being kept together, under the sheriff's charge, during the said adjournment, as the law absolutely requires, for the purpose of preventing undue prejudices and influences from reaching the jury and determining the verdict, as actually happened in this case."

Were the court to confine its examination to those points alone upon which its judgment is based, the fourth reason which was assigned why the judgment should be arrested, would be sufficient for that purpose ; but believing it important for the proper administration of the criminal law of the State, that all doubtful points should be elucidated and finally settled whenever practicable, so as to furnish a proper guide for the inferior tribunals, the various reasons assigned for the reversal of the judgment will be examined, and in the order in which they are presented by the record. And first, as it regards the affidavit of the discovery of new testimony. This court has already said, in the case of *The State* v. *Clark, ante,* 533, *that it is not sufficient to warrant the granting of a new trial, that the newly discovered evidence might have the effect of throwing a shade of doubt over some of the incidental circumstances of the trial ; it should appear to be of so decided a character, that if admitted, it would give an acquitting complexion to the case.* This opinion, the court believes, establishes the true doctrine ; in other words, the testimony should appear to the court to be such as might probably produce a different verdict, to justify the court in sustaining the motion. Whether the affidavit in the present case comes within the rule here laid down, is not necessary to decide.

The four grounds urged in arrest of judgment will be examined *seriatim,* and in their order.

The argument of the counsel for the prisoner informs the court, that the indictment is not wholly in the English language, in this, that the word *extravasion,* which forms a part of the description of the cause whence death ensued, is not an English word, and consequently that the indictment is not in the language required by the constitution. The court believes that this strictness would not be required in an English court, nor by an English judge. In 1st Chitty, p. 141, (Riley's edition, 1819,) it is stated, that this strictness does not so far prevail as to render an

indictment invalid, in consequence of the omission of a letter, which does not change, the word into another of a different signification, as *undertood* for *understood*, and *recevd.* for *received.* It is also laid down, that every indictment must charge with such certainty and precision, that it may be understood by every one. Now if it be admitted that there is no such word in the English language as *extravasion*, neither is there any such word as *undertood*, which latter word in England was considered amply sufficient and explicit, and sufficiently precise to be understood by every one, and therefore that the prisoner should not be permitted to pretend ignorance of what every one else understood. If the prisoner in the present case complain, that he does not understand the word *extravasion*, neither would he have understood the word *extravasation* (the word intended to be used, as admitted in the argument,) if that word had been used, and which would have been unobjectionable. Comprehending the word *extravasation*, therefore, which he would have been bound to do had it been found in the indictment, it is difficult to conceive how he could have been bewildered by the substitution of the word *extravasion.* Knowledge of the genuine word would have furnished an unerring guide to the meaning of the substitute. The charge however is properly laid in the indictment, if the objectionable word were entirely omitted, as surplusage, which the court was authorized to do. *Vide State* v. *Mc-Coy and others*, decided by this court at its last term. Formerly in England, the judges felt themselves constrained to adhere so strictly to form, that public justice was in many cases evaded, and the most dangerous malefactors let loose upon society, in consequence of the omission of some senseless and unmeaning form. The failure on the part of the prosecution to dot an *i*, or to cross a *t*, or something equally absurd, was considered sufficiently fatal to vitiate the whole proceedings. Substance was sacrificed to form, or rather form became substance, and substance mere form. A more correct and just appreciation of criminal justice has banished from the English courts these legal absurdities, which answered no other purpose than to protect and screen the guilty from the just punishment of their crimes. They will no longer permit the guilty man to escape punishment by averring that he cannot comprehend, and does not understand, what is palpable and evident to the common sense of every body else. True, these modern changes may not have the binding force of law in Louisiana; still it is believed, that the principles of justice should and must be the same every where, and should be carried out upon all occasions, when not prohibited by positive legal enactment. Without inquiring whence the English courts and English judges derive authority for these wise, salu-

tary and indispensable changes, that authority was undeniably confided to the courts of criminal jurisdiction in Louisiana, by the act of 1805, introducing the common law of England; this train of reasoning is applicable to, and disposes of, the first, second and third reasons filed in arrest of judgment. *Vide* for the description of the wound, *The State* v. *McCoy and others*, already referred to.

The separation of the jury, this court is of opinion, is fatal to the regularity of the proceedings of the court below, and entitles the accused to relief. This ground not being apparent upon the record when the motion was made, offered no cause to arrest the judgment; but the fact that the jury *did* separate, being shown to this court *now*, by the transcript filed and proceedings had in the lower court, will be examined as if offered on the motion for a new trial, which was the proper course.

The decisions upon this point, both in the United States and in England, have been various and contradictory. In early times, the rule was unbending, that the separation of the jury was fatal to their verdict, and in cases where the court was obliged, *ex necessitate*, to adjourn, the jury was placed in charge of a bailiff, who was sworn to keep them together. 6 Durnf. & East, 530. In modern times the rigor of this rule has, in many instances, been relaxed; but the decisions are so contradictory and conflicting that the question may still be fairly considered unsettled. Thus in Virginia the old rule prevails, and a separation of the jury is fatal to their verdict. In North Carolina the decisions are *both* ways. 1 Haywood, 241; 2 Haywood, 238. So in New York, in *McLeod's Case*, as reported by Gould, page 16, the court *directed the sheriff to provide lodgings and places to take their meals for the jury, as it would be necessary to keep them together during the whole of the trial, and to provide them with accommodations as near the court as possible.* Graham on New Trials, 91, *et seq.* 1 Chitty, 628. Roscoe, Crim. Ev. 178. *Aliter* in Kentucky. The point appearing thus unsettled and *sub lite*, this court feels itself authorized to give a preference, and to adopt that rule which seems to offer the greatest security to the accused, and, at the same time, trenches in nowise upon any right necessary to ensure the due and proper execution of the law.

In *capital* cases, the jury should not be permitted to separate after they have been sworn, either with or without the consent of the prisoner. This rigor which the court conceives to have been the *universal* practice in the country parishes, can lead to no bad consequences. This precaution is necessary to protect the accused from any undue influence which may be exercised upon the members of the jury, even without their knowledge, and can-

not be tortured into a disparagement of their integrity. Improper impressions may and will be made upon their minds by artful and designing men, of which they may be perfectly unconscious; neither can they shut their ears to the expression of popular opinion; and as well might the administration of the juror's oath be considered as conveying a doubt of his integrity, as this temporary seclusion from intercourse with the community at large. In cases *not* capital, courts may, in their discretion, permit the jury to disperse until after they have received the charge of the court; but they should not be permitted to separate after the charge has been given. In *these* cases, misconduct on the part of the jury will set aside their verdict; in capital cases, upon a separation, misconduct and abuse will always be presumed.

One other question still remains to be examined, viz. the *extent* of the right guaranteed to the accused by article 6, section 18, of the constitution of the State. The section reads as follows: "In all criminal prosecutions the accused shall have the right of being heard, by himself or counsel, of demanding the nature and cause of the accusation against him, of meeting the witnesses face to face; of *having compulsory process for obtaining witnesses in his favor*," &c.

In the present organization of our courts having criminal jurisdiction, no power is given to them to coerce the personal attendance of witnesses except within restricted territorial limits. The process of no court of original criminal jurisdiction is co-extensive with the State. No statutory provision clothes the Criminal Court of New Orleans, (*exempli gratia*,) with authority to coerce the personal attendance of Kelly, the witness in this case, who resides in Bayou Sara; and yet this constitutional provision, at first blush, would seem to confer a right upon the accused of which the Legislature could not deprive him, by making him amenable to the jurisdiction of a court, inefficient, from want of authority, to enforce this constitutional enactment; but to a proper understanding of this article in the constitution, it is necessary to revert to the cause and origin of the principle thus consecrated, not only in our own constitution, but in that of the United States, and of many of our sister States. It should be remembered, that this right was in former times, in England, withheld from the accused; not only were they denied the right of issuing process for their witnesses, but the witnesses, (if present,) were not permitted to be sworn; the right was at length extorted from the government by the people, and considered at the time an extraordinary *concession*, not a privilege or absolute right. Our forefathers, recurring to the time when the people had no such right, and the difficulty with which it was wrested from the government, incorporated the principle into the constitution, and

made it a part of the fundamental law of the land, whence it has been copied into most of the constitutions of the States. Thus explained, it simply means to say, that the accused shall not be debarred the right of issuing *subpœnas* for his witnesses, as in civil cases. Such is the construction given to a similar provision of the constitution of the United States. It is merely the enunciation of a principle, which to us, in the enjoyment of all the rights of freemen, may otherwise appear uncalled for, preposterous, and *too* plain a proposition to require insertion in the constitution. With equal propriety might it be said, that the right secured to the accused, in the same article, of being heard by himself or counsel, and the exemption from being compelled to give evidence against himself, as also the prohibition upon the Legislature of passing *ex post facto* laws, or laws impairing the obligation of contracts, in the following section, were likewise principles too plain to require a constitutional recognition ; and yet, there they are to be found, and will probably find a place in the new as well as in the present constitution.

This view of the article in our constitution is most ably illustrated by Chief Justice Spencer, in the construction given by him to the words, " nor shall any person be subject for the same offence, to be *twice* put in jeopardy of life or limb," contained in the fifth article of the amendments to the constitution of the United States. " The expression," jeopardy of limb, says this enlightened jurist, " was used in reference to the nature of the offence, and not to designate the punishment of an offence, for no such punishment as loss of limb was inflicted by the laws of any of the States, at the adoption of the constitution. Punishment by the deprivation of the limbs of the offender, would be abhorrent to the feelings and opinions of the enlightened age in which the constitution was adopted, and it had grown into disuse in England for a long period antecedently. We must understand the terms, *jeopardy of limb*, as referring to offences which, *in former ages*, were punishable by dismemberment, and as intending to comprise the crimes denominated *felonies*. The question then recurs, what is the meaning of the rule, that no person shall be subject, for the same offence, to be twice put in jeopardy of life and limb. Upon the fullest consideration, which I have been able to bestow on this subject, I am satisfied it means no more than this ; *that no man shall be tried twice for the same offence.* Should it be said, that we can scarcely conceive that a principle so universally acknowledged, and so interwoven in our institutions, should need an explicit and solemn recognition in the fundamental principles of the government of the United States, we need recur only to the history of that period, and to some other of the amendments, in proof of the assertion, that there existed such a jealousy or extreme caution on

the part of the state governments, as to require an explicit avowal in that instrument, of some of the plainest and best established principles in relation to the rights of the citizens and the rules of common law ; the first article of the amendments prohibits Congress from making any law respecting an establishment of religion, prohibiting the free exercise thereof, or abridging the freedom of speech or of the press, or the right of the people peaceably to assemble and petition government for a redress of grievances ; the second secures the right of the people to bear arms; and indeed without going into them minutely, nearly all the amendments of that instrument indicate either great caution in defining the powers of the national government, and the rights of the people and the States, or they evince a jealousy and apprehension that their fundamental rights might be impugned, so as to leave no doubt, that in the article under consideration, no new principle was intended to be introduced." 1 Wheeler's Criminal Cases, 470, *et seq.*

This lucid exposition, given by Chief Justice Spencer, of the fifth article of the amendments to the constitution of the United States, furnishes a convincing and satisfactory key by which the eighteenth section, sixth article, of the Louisiana constitution may be opened to our examination, and its true intent and meaning eviscerated and established ; and if the authority of his name were permitted in this instance, by northern abolitionists to exercise the same influence, and to be entitled to the same respect and weight, as is conceded to it by all others, it would put to rest all cavil upon the meaning of the words " the right of the people peaceably to assemble and to petition," &c., in the first article of the amendments to the constitution of the United States.

Putting out of view, the question whether the existence of slaves in a sister State be a *grievance* against which they have a right to petition or not, it merely recognizes, if Judge Spencer's doctrines and reasoning be correct, the right of the people *to assemble and petition ;* a right, to be sure, which we can scarcely imagine could ever have been denied or called in question, did we not know, that this was the grievance of which they complained in England, where their peaceable assemblies were dispersed, by order of government (after reading the riot act,) at the point of the bayonet. The people here, therefore, (as they could have done, if no such constitutional provision existed,) may *peaceably assemble,* and petition Congress, without let or hindrance ; without having before their eyes the fear of soldiery, or their ears offended by the reading of riot acts, &c., leaving to the government afterward to make such disposition of their petitions, and to take such action, as to it may appear meet and proper. The right to assemble and petition circumscribes and comprises

all that is recognized and all that was intended to be guaranteed to the people. Carrying out the views of Judge Spencer, and giving to his reasoning a fair and *bona fide* application, this would be its legitimate interpretation, securing to the people the right to assemble and petition, and neither purporting nor intending any enactment restrictive of the power of government to make any disposition it pleased, of the petitions when presented.

From this view we deduce, that the courts of criminal jurisdiction, not being vested with power beyond a certain prescribed and defined limit, compulsory process cannot issue beyond said limit; that the accused has an undoubted right under the constitution, to have his witnesses heard, whether they be found within or beyond said limits; that the provision of the constitution allowing the accused to be confronted with the witnesses against him, is a personal privilege which he may waive; that being entitled to a speedy trial and to compulsory process to enforce the attendance of his witnesses, this latter right can only be exercised when the witness resides or is found within the district; that the Legislature having failed to provide means to coerce the personal attendance of the witnesses, it follows as a necessary corollary, that recourse must be had to the ordinary and only remaining method of procuring testimony, viz: by commission.

Wherefore it is ordered, that the judgment of the criminal court be set aside, cancelled and annulled; that a new trial be granted; and that the said criminal court conform to the principles herein established, upon the trial and prosecution of the appellant, Leonard C. Hornsby.