## STATE v. F. BRUNETTO.

Dying declarations of the deceased are admissible, although given in the absence of the prisoner.

Counsel for the prisoner asked the question of a witness who had testified as to the dying declarations of the deceased, "From your knowledge of the character of the deceased, and from her conduct on the occasion of the conversation held with you by her, do you think she was under a religious sense of her responsibility to her Maker?" *Held :* That the question was inadmissible.

The Supreme Court has not jurisdiction to revise the judgment of the District Court refusing a new trial, the motion for which was based on the misconduct of the jury—for in criminal cases the jurisdiction of the Supreme Court is restricted to questions of law, and the conduct of the jury involved matters of fact.

APPEAL from the First District Court of New Orleans, *Hunt*, J.

*E. Warren Moïse*, Attorney General, for the State. *Hill* and *B. F. Tappan*, for the appellant.

VOORHIES, J. The defendant was found guilty of murder, without capital punishment, and was sentenced for life to the State prison.

The case comes up on two bills of exceptions and two motions for a new trial.

1. The first bill of exceptions was taken to the ruling of the court below in favor of the admissibility of the dying declaration of the deceased, although given in the absence of the prisoner.

The reason for the rejection of hearsay evidence is, that the party against whom it militates has not had the benefit of a cross-examination, and because the declarant did not speak under the sanction of an oath. An exception to this rule obtains, in cases of dying declarations, the sense of impending dissolution being considered as offering the necessary guarantees that the declaration is in accordance with the truth. Although it is indispensable that the whole declaration be given in evidence, it is not required that the party accused be present at the time it was given. Any other construction of the law would have the effect of shutting out this species of proof; for if the prisoner were present, it would be unnecessary that such declaration should be *in extremis* in order to determine its admissibility in evidence. The defendant's objection was, therefore, properly overruled.

2. The District Judge properly overruled the following question, propounded on behalf of the defendant to one of the State witnesses :

"From your knowledge of the character of the deceased, and from her conduct on the occasion of the conversation held with you by her, do you think she was under a religious sense of her responsibility to her Maker ?"

Witnesses are to be examined on the facts of the case; and are not expected to give their opinions on the conclusions, which it is the province of the court and jury to draw.

3. The first motion for a new trial is based on the allegation, " that while the jury were deliberating upon a verdict in this case, and before they agreed to and rendered their verdict in court, they were permitted to intermingle, converse and eat with and at the same table with one *Mr. Hincks*, and several other gentlemen, whose names are unknown to affiant."

The second, or rather amended motion for a new trial, states: " That since the filing of the original motion for a new trial in this case, new and material facts have been discovered, which are as follows: that while the jurors were out and were considering their verdict, brandy and other spiritous liquors were drank by several of the jurors; and that also at dinner said jurors partook freely of wine; and that after dinner a bottle of Champagne wine was bet by two of the jurors upon the price of the dinner, which said wine was drank by the jurors and the Deputy Sheriffs; and that the said dinner was paid for by the State." The District Judge allowed the amendment, for the purpose of adding as an additional ground for a new trial, " the above irregularity and misconduct of the jury as above set forth." In truth both motions allege the irregularity and misconduct of the jury, with this difference, however, that the amended motion is more explicit on the subject. They both present for adjudication questions of fact, and, although they are accompanied by the testimony taken down by the Clerk, we cannot decide whether the conclusions of the District Judge were correct or erroneous. Our appellate jurisdiction in criminal matters is limited to questions of law alone; and it has been repeatedly decided that, as regards continuances and motions for new trials, this court would not, and could not, interfere with the ruling of the court of the first instance, " unless brought before it in such a mode as to present for solution an unmixed question of law;" (*State* v. *Bass*, 11 An., 478,) and also " that the only proper mode of bringing the subject before this court, is by bill of exceptions, which will show affirmatively on its face, that the ruling of the District Court was predicated exclusively upon a matter of law, in which the court erred." 11 An., 422. In the case at bar, there is no bill of exceptions, showing that in the motion for a new trial the court below erred in any question of law, mixed or unmixed; and in the assignment of errors, there is no complaint whatever of any error of law committed to the prejudice of the prisoner; but it is alleged in so many words: " That facts developed upon the motion for a new trial show the trial to have been irregular, and that the misconduct of the jury vitiated the verdict." The proof of the irregularity and of the misconduct of the jury, may or may not be satisfactory. With this we have nothing to do; for that is a question of fact, which rests in the sound discretion of the District Judge, and is not subject to our revision; *State* v. *Brette*, 6 An. 657, 662; 6 An., 311; 7 An., 582; *State* v. *Tucker*, 10 An., 501. Had he decided erroneously any question of law connected with the matter, and had such decision been presented in proper shape before us, we might grant relief. It has already been decided, that the jury are entitled in all cases to necessary refreshments. 4 An. 27. This is a question of law which we could decide; but what constitute necessary refreshments? and whether the verdict is or is not to be affected in any given case, is certainly a question of fact, and, as such, cannot be revised by this court.

It is, therefore, ordered and decreed that the judgment of the court below be affirmed, with costs.

SPOFFORD, J., concurring.   In overruling the motion for a new trial the District Judge observed : " that he considered the irregularities in the present case as not of a nature to have influenced, in the smallest way, the mind of the jury in the verdict which they rendered."

In this I find no error of law presented in a shape to be cognizable by this court.   The Judge had the jurors before him, and was not bound by the opinions or testimony of witnesses, disregarding what he saw with his own eyes.   I think he has not made a statement of facts in such a form as to show that his opinion was predicated, as a conclusion of law, *from those facts alone.* And there is no agreed or admitted statement of facts submitted to this court as a basis for solving the question whether the law infers therefrom a fatal irregularity in the conduct of the jury.

I, therefore, concur in the decree.

MERRICK, C. J., dissenting.   The case of *The State* v. *Tucker*, 10 An. 501, appears to have overruled the cases of *The State* v. *Hornsby*, 8 Rob. 558, 592, and *State* v. *Desmond and O'Conner*, 5th An. 398, so far as those cases might have justified the inference that this court would examine and decide for itself questions of fact in order to ascertain whether the jury who had tried the case in the lower court had or had not been guilty of misconduct.

But I do not understand the case of *The State* against *Tucker*, as deciding that this court cannot in any case take cognizance of a question of law submitted to the lower court, because the same was mixed with the facts.   On the contrary, it assumes that the cases of *The State* v. *Hornsby* and *The State* v. *Desmond and O'Conner* were correctly decided because the facts were admitted in the Supreme Court, whereas in the case of *The State* v. *Tucker* the facts were disputed.   10 An. p. 502.

The Constitution, in limiting the jurisdiction of this court to questions of law, was not intended to prevent all control on the part of this court over questions of law (which should happen to be mixed with facts) submitted to the determination of the District Judge without the intervention of a jury. But I think it was the intention of the framers of that instrument to allow the accused the privilege of separating every legal question from the fact, and thus presenting it to this court.   By allowing the accused an appeal on questions of law, as an incident, it allows him the means of separating the law from the fact and presenting it as a question to this court.   On the trial to the jury, the accused can accomplish this by excepting to the Judge's charge, on all interlocutory questions, by requiring the Judge to state whether he credits the witnesses, or what facts he considers as established, and bringing them up with the bill of exception.

This is brought about, in some States, by the Judges' notes at the *nisi prius* trials which are reserved for the consideration of the court *in bank.*

Without this right on the part of the accused, the trials in criminal cases would be necessarily imperfect and there would be no redress if the District Judge should express an opinion upon the most important question of law, if it should happen to be mixed with any facts however insignificant.

In the case at bar no bill of exceptions was needed.   The motion for a new trial is a part of the record and speaks for itself.   So does the decree overruling the same.

The testimony, which is not disputed by the State, is found by the District Judge. It is as follows, viz:

"The testimony of Deputy Sheriff, *Alpuente*, shows briefly and in substance that he took the jury, after they had been deliberating for some time in the jury room, to a public house—a restaurat, to furnish them with some refreshments in pursuance of an order of court; that he had engaged for the purpose two rooms connected with one another by a folding door; that he caused dinner to be served up there; that the Deputy Sheriffs and himself, attendant on the jury, sat at a table in one of the rooms, and the jury sat at a table in the other room during the dinner; that just before the dinner, each of the jurors had a glass of absynthe and water or anisette; that six bottles of red wine were allowed the jury for dinner, and that a bottle of brandy was brought in by the restaurat keeper, at his own cost, after dinner, with the coffee; about half of which bottle, he believed, was drank by all the jurors. That two of the jurors, after dinner, made a bet about the price of the dinner and referred to him to decide it, and that the loser, by his permission, called and paid for a bottle of champagne, which was drank by the witness and five or six of the jurors.

"This is the testimony with respect to the drinking.

"*Alpuente*, further testifying, said, that the jury were upwards of two hours in the room at the restaurat; that while they were there, they did not deliberate on the case; that he and his assistant deputies did not speak with any juror on the subject of the case; that he had given express orders to his deputies not to speak to any juror on the subject; that he had also cautioned the jurors against speaking to him or his assistants on the subject; that there was no conversation between any of the jury and himself, or any of his deputies, about the case; that the folding doors between the rooms were open and the jury under his view during the whole time the jury was at the restaurat; that no juror was at all intoxicated; that all the jurors behaved with the greatest propriety; that after dinner, the jurors smoked and walked about the rooms and mingled with the Deputy Sheriffs, and that shortly after, he carried the jurors back to the jury room, where they renewed and continued their deliberations together, until they made up their verdict.

"*Alpuente* further stated that the jury did not separate from one another at any time.

"This condensed testimony brings to view several irregularities, which must be avoided in the future.

"The dinner was protracted too long. The deputies should not have remained in the same room with the jury and eat their dinner where they did —there should have been no communication or intercourse other than official between the Sheriff and the jurors, however innocent the nature of that communication.

"The Sheriff should keep the jury within his view, so that they may not separate or engage in any acts foreign to their trust, but he should not be present among the jurors and privy to their conversation; a proper provision should be made for the sustenance and comfort of the jury while employed in the most serious and important office that can be exercised by man; but that provision should be restricted within the safe and reasonable bounds of temperance and moderation. Betting in the jury room, although, in the instance, not having the least reference to the case before the jury or any influence

upon the verdict, is disapproved and reprobated by the court as a practice of a tendency pernicious to public justice.

"But the court considers the irregularities in the present case as not of a nature to have influenced in the smallest way the minds of the jury in the verdict which they rendered."

The facts, therefore, I consider found to our hands, and in considering the question of law arising therefrom, we are merely doing what every court of error does in a like case, and precisely what is conceded, in the case of *The State* v. *Tucker*, may be done.

If I read the decisions of this court correctly, the inference to be deduced from them all, is that this court will consider the legal question whenever the record presents it in such a form, that it can be reached without deciding a contested fact in order to arrive at the question.

I think, therefore, we are compelled to decide whether the facts narrated by the District Judge amount to such misconduct on the part of the jury as to require that their verdict should be set aside.

Perhaps, in favor of a beverage of such common use for the table as claret, we ought to presume that the six bottles were so distributed among the twelve jurors as not to disqualify any one of them from giving the accused an impartial and intelligent consideration of every fact in his case, however complicated the facts may have been. But in this case, in addition to the absynthe and anisette, and claret, the jurors were furnished with a bottle of brandy which was partaken of by some of them. The Deputy Sheriff, it is true, presumes it was not all drank, because no brandy was charged in the bill for the dinner. Still some of the jurors drank of it. To this a bottle of champaign was added, which was drank by five or six jurors.

It is possible that some one juror partook of absynthe, claret, brandy and champaign in proportions larger than his fellows, during the two hours spent over the dinner, and thus that one or more of the jurors were not in possession of that unclouded intellect which the accused had a right to demand. The possibility that this might have occurred, I think entitles the prisoner to a new trial.

The safer rule is to exclude spirituous liquors entirely from the use of the jury in capital cases, and so I understand the current of decisions to tend. See the cases of *People* v. *Douglass*, 4 Cowen, 26; *Brant* v. *Fowler*, 7 Cowen, 562; *Kelly* v. *Read & Wilson*, 15 Johns, 423; *Commonwealth* v. *Roby*, 12 Pick. 520; *Page* v. *Pelham*, 1 English, 535; *Gregg* v. *McDaniel*, 4 Harrington, 367; and *Jones* v. *The State*, 13 Texas R. 168.

The rule has this merit also, it relieves the court from the trouble of deciding whether the quantity of liquor which a juror has drank, in reference to his constitution and habits, is or is not immoderate.

Mr. Justice COLE concurs in this opinion.

---

Reasons given by Judge HUNT for refusing the new trial asked for in the lower court:

"A motion for a new trial was made in this case on the 22d July, inst., by Mr. Abell, of counsel for the defendant, on several grounds.

"1st. That the verdict of the jury is against law and evidence."

This ground is of a vague and indefinite character and presents nothing for examination.

STATE
v.
BRUNETTO.

The court is firmly of opinion that the verdict of the jury is supported by law and evidence and ought not to be disturbed.

"2d. That the jury were not kept separate and apart during their deliberations, but were permitted to sit at table and eat in company with *Mr. Hincks* and other gentlemen, whose names are to the said *Brunetto* or his counsel unknown, and who were not members of the jury, contrary to law and against the instructions of this court."

This ground will be disposed of hereafter as connected with the ground of of the second motion for a new trial filed in this case.

"3. That the court erred in admitting the pretended dying declarations of *Mary Jane.*"

An exception was taken to the ruling of the court on this subject.

The court remains of opinion that the ruling was correct.

See exception.

"4. That the court erred in sustaining the objection of the Attorney General to the following question propounded to *Revoile*, a witness for the State.

"From your knowledge of the character of the deceased, and from her conduct on the occasion of the conversation held with you do you think she was under a religious sense of her responsibility to her Maker?"

The opinion of the court on this ground will be seen in the statement of the court appended to the exception on file on this subject.

A second motion for a new trial, or an amendment of the first motion, based on an affidavit of the defendant, was, on leave of the court, made by *Mr. Abell* and *Mr. Tappan*, of counsel for the prisoner, on the 25th July, inst.

The following contains the grounds of the motion :

"That while the jurors were out and were considering their verdict, brandy and other spirituous liquors were drank by several of the jurors, and that also at dinner said jurors partook freely of wine, and that after dinner a bottle of champagne was bet by two of the jurors upon the price of the dinner, which said wine was drank by the jurors and the Deputy Sheriff, and that said dinner was paid for by the State. It is hereby ordered by the honorable court that the defendant have leave to amend his original motion for a new trial, and to add as another cause the above irregularity and misconduct of the jury as above set forth."

See motion.

The allegations in the motion with respect to drinking, refer, as the court understands them, to the mere fact of drinking. It is stated that at dinner the jurors partook freely of wine, but it is not expressly and positively averred, that any juror was guilty of any excess, or was rendered unfit by drinking for the discharge of his duty, or that the drinking had any effect on the final result of the deliberations of the jury.

"The testimony of Deputy Sheriff, *Alpuente*, shows briefly and in substance that he took the jury, after they had been deliberating for some time in the jury room, to a public house—a restaurat, to furnish them with some refreshments in pursuance of an order of court ; that he had engaged for the purpose two rooms connected with one another by a folding door ; that he caused dinner to be served up there ; that the Deputy Sheriffs and himself, attendant on the jury, sat at a table in one of the rooms, and the jury sat at a table in the other room during the dinner ; that just before the dinner, each of the jurors had a glass of absynthe and water or anisette ; that six bottles of red wine were allowed the jury for dinner, and that a bottle of brandy was brought in by the restaurat keeper, at his own cost, after dinner, with the coffee ; about half of which bottle, he believed, was drank by all the jurors. That two of the jurors, after dinner, made a bet about the price of the dinner and referred to him to decide it, and that the loser, by his permission, called and paid for a bottle of champagne, which was drank by the witness and five or six of the jurors."

This is the testimony with respect to the drinking.

"*Alpuente*, further testifying, said, that the jury were upwards of two hours in the room at the restaurat ; that while they were there, they did not deliberate on the case ; that he and his assistant deputies did not speak with any juror on the subject of the case ; that he had given express orders to his deputies not to speak to any juror on the subject ; that he had also cautioned

the jurors against speaking to him or his assistants on the subject; that there was no conversation between any of the jury and himself, or any of his deputies, about the case; that the folding doors between the rooms were open and the jury under his view during the whole time the jury was at the restaurat; that no juror was at all intoxicated; that all the jurors behaved with the greatest propriety; that after dinner, the jurors smoked and walked about the rooms and mingled with the Deputy Sheriffs, and that shortly after, he carried the jurors back to the jury room, where they renewed and continued their deliberations together, until they made up their verdict."

*Alpuente* further stated that the jury did not separate from one another at any time.

This condensed testimony brings to view several irregularities, which must be avoided in the future.

The dinner was protracted too long. The deputies should not have remained in the same room with the jury and eat their dinner where they did —there should have been no communication or intercourse other than official between the Sheriff and the jurors, however innocent the nature of that communication.

The Sheriff should keep the jury within his view, so that they may not separate or engage in any acts foreign to their trust, but he should not be present among the jurors and privy to their conversation; a proper provision should be made for the sustenance and comfort of the jury while employed in the most serious and important office that can be exercised by man; but that provision should be restricted within the safe and reasonable bounds of temperance and moderation. Betting in the jury room, although, in the instance, not having the least reference to the case before the jury or any influence upon the verdict, is disapproved and reprobated by the court as a practice of a tendency pernicious to public justice.

But the court considers the irregularities in the present case as not of a nature to have influenced, in the smallest way, the minds of the jury in the verdict which they rendered.

It has been held by the Supreme Court, that: "Every irregularity will not vitiate a verdict, but those only which are calculated to produce an impression on the minds of jurors, and influence the verdict which they are to render, (2 Sumner, 83); and courts will satisfy themselves that such has been the tendency of the acts complained of, before new trials will be granted on the ground of misconduct on the part of the jury." *The State* v. *Kennedy*, 8 Rob. R. p. 593.

This principle has been expressly applied where the exception was that the jury drank ardent spirits at their meals during the progress of a trial, "a fair and unbiassed expression of opinion is what is required, and any little misconduct, which is shown could not have been attended by bad consequences, will not vitiate a verdict." 4 Humphrey's R., *Stone* v. *The State*, p. 88. Authorities abound on the same point and may be found cited in 1 Arch. p. 178, 21.

The object of the law is a fair and impartial trial by a jury of the country, and this object has been clearly attained in the case under consideration.

The evidence shows that the jurors were faithfully kept together, and that no one took part in their deliberations.

The last in the series of the defendant's allegations is, that the dinner which the jury eat was paid for by the State. Nothing was said on this matter by the counsel of the defendant in their remarks to the court. The allegation is true, and the fact is as it ought to be. It is just and proper that the State should furnish necessary nourishment to a jury engaged in the administration of justice and confined for many hours deliberating upon the important issues submitted to their judgment.

The State is concerned only for justice; and the duty of the jury is to find a just verdict according to the law and the evidence, whether that verdict is favorable or unfavorable to the party accused. The court cannot conceive how the payment by the State of the expense of a dinner can influence the mind of a juror to the prejudice of one under trial.

The payment for the dinner was in conformity with well established usage.

The motion for a new trial is denied.