518 So.2d 1024 (1988)
STATE of Louisiana
v.
William F. SCHRADER.
No. 87-K-1059.
Supreme Court of Louisiana.
January 18, 1988.
*1026 Anthony P. Champagne, Office of the Indigent Defender, Houma, for applicant.
William J. Guste, Jr., Atty. Gen., Douglas H. Greenburg, Dist. Atty., Allen Helm, III, Asst. Dist. Atty., for respondent.
COLE, Justice.

ISSUES
The numerous issues in this case are raised by the errors assigned and briefed by the defendant; and, in addition, the defendant's application to this court suggested an error patent on the face of the record, i.e., the non-sequestration of the jury in a capital case. The latter matter, plus concerns about the sufficiency of the evidence, prompted us to grant certiorari. Having reviewed the errors assigned and having examined the lack of sequestration of the jury, we conclude defendant's conviction and sentence must be affirmed.

FACTS AND PROCEDURAL POSTURE
About 10 p.m. on the evening of October 31, 1970, a fire destroyed the house defendant and his family were renting in Houma, Louisiana. Inside at the time of the fire were defendant's wife (Audrey), her daughter by a previous marriage (Elizabeth) and her daughter's friend (Catherine Smith). Catherine, aged 9, died as a result of injuries sustained in the blaze. Elizabeth suffered permanent brain damage. Audrey was hospitalized but survived without major injury. The blaze was investigated by both state and city fire officials, and, while no firm conclusions were reached as to its origins, arson was not ruled out. There the matter stayed until June of 1985 when city detectives received information that the fire had been deliberately started by defendant. Experts reexamined the burned-out remains, and after at least one concluded the fire was intentionally set. Defendant was indicted for the murder of Catherine Smith.
The indictment charged defendant with "first degree" murder in violation of La.R. S. 14:30. However, the alleged murder occurred in 1970, and prior to 1973 La.R.S. 14:30 did not distinguish between first and second degree murder. Thus, prior to trial on the merits, the state amended the indictment to charge defendant with murder. Defendant pled not guilty.
At trial the following year, the state presented evidence that defendant, at some point prior to the fire, threatened to burn down the house. There was also evidence that defendant purchased a small amount of gasoline about two hours before the fire started. Jurors returned with a responsive verdict of guilty of manslaughter. The appellate court affirmed. State v. Schrader, 506 So.2d 866 (La.App. 1st Cir.1987).
Defendant now seeks review of the appellate court decision, reurging thirteen of the fifteen assignments of error made at the Court of Appeal.
The assignments of error, as numbered by the defendant, are as follows:
1. The trial court erred in denying defendant's motion to suppress.
2. The trial court erred in denying defendant's motion to quash.
3. The trial court erred in denying the defendant's motion for bail in a capital case.
4. The trial court erred in overruling the defendant's objection to the state amending it's answers to the bill of particulars on the morning of the trial.
5. The trial court erred in denying the defendant's motion for a continuance based on the absence of a material witness.
8. The trial court erred in overuling the defendant's objection to the state's questioning of Judy Smith Griffith dealing with threats made by defendant.
9. The trial court erred in denying the defendant's motion for a mistrial.

*1027 10. The trial court erred in sustaining the state's objection to defense counsel's question of Howard Oubre dealing with whether or not he had discovered any witnesses who saw the defendant at the scene of the fire.
11. The trial court erred in overuling the defendant's objection to the state's reading of materials from a book and then asking witness Howard Oubre if he agreed with those statements.
12. The trial court erred in overruling the defense counsel's objections to the state's question of William F. Schrader regarding a civil lawsuit filed in connection with the fire.
13. The verdict of the jury was contrary to the law and to the evidence.
14. The trial court erred in denying the defendant's motion for a new trial.
15. The sentence imposed by the trial court was excessive and improper under the circumstances and amounted to cruel and unusual punishment.

ASSIGNMENT OF ERROR NUMBER ONE
By this assignment of error, defendant argues that certain testimony should have been suppressed. Harold Foret, a neighbor, testified that while visiting the Schrader home in 1970 he witnessed a domestic dispute between defendant and his wife in which defendant threatened to burn down the Schrader house. Harold Foret testified that the statement was made a "day before or week before" the house burned down.
Defendant argues, in brief, that this testimony was unreliable and irrelevant, in particular because defendant was intoxicated at the time and because the statements were made sixteen years before the trial. We disagree with defendant. The threats were admissible to show the defendant's state of mind shortly before the fire, and relevant on the question of whether he then made good on his word. State v. Martin, 458 So.2d 454 (La.1984); State v. Weedon, 342 So.2d 642 (La.1977).
In the motion to suppress, defendant forwarded an additional argument. He suggested the statement was not freely given and for that reason should have been suppressed. We agree with the Court of Appeal on this issue.
The record clearly indicates that defendant's threats were unsolicited, voluntary statements made in a non-custodial situation in the presence of individuals not associated with any law enforcement agency. Louisiana procedure does not authorize the use of a motion to suppress to test the admissibility of evidence constitutionally obtained, as in this instance. See La.C.Cr.P. art. 703; State v. Garnier, 261 La. 802, 261 So.2d 221 (1972). Schrader, 506 So.2d at 870.
Motions to suppress filed under La.C.Cr.P. art. 703 address only constitutional violations, State v. Matthieu, 506 So.2d 1209, 1212 (La.1987), and an essential prerequisite for suppressing a statement on voluntariness grounds is misconduct or overreaching by the police. Colorado v. Connelly, ___ U.S. ___, 107 S.Ct. 515, 93 L.Ed. 2d 473 (1986).
For the foregoing reasons, this assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER TWO
By this assignment of error, defendant says his indictment should have been quashed because he was denied his right to a speedy trial. The offense occurred on October 31, 1970, but defendant was not arrested or formally charged until September of 1985. The defendant argues the delay made it virtually impossible for him to defend himself properly.
Both the trial court and the appellate court correctly interpreted this assignment of error as going to preindictment delays and, as such, not involving the speedy trial clause of the Sixth Amendment. United States v. Marion, 404 U.S. 307, 92 S.Ct. 445, 30 L.Ed.2d 468 (1971); United States v. Lovasco, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). The First Circuit then looked to the jurisprudence of this Court, particularly to State v. Malvo, 357 So.2d 1084 (La.1978), to deny relief where the *1028 delays impacted "equally" on both sides and where the state's experts "based their opinions on evaluation of the site undertaken a short time prior to defendant's arrest." Schrader, 506 So.2d at 870.
Malvo contains a full discussion of the federal jurisprudence, with this Court reiterating the principle that constitutional guarantees to a speedy trial are not invoked until a citizen becomes an accused, either by arrest or indictment. Malvo went on to articulate the standard to evaluate complaints over untoward delays in initiating prosecutions:
The proper approach in determining whether an accused has been denied due process of law through a preindictment or pre-arrest delay is to measure the government's justifications for the delay against the degree of prejudice suffered by the accused.

Malvo, 357 So.2d at 1087.
Malvo thus employed a "balancing of the interests" between the government's reasons for the delay against prejudice demonstrated by the defendant. While declining to enunciate an inflexible rule (noting the state's interest in protecting its investigation "will not be sufficient to justify a delay which causes significant prejudice"), this Court nevertheless found the contended for prejudice lacking. Id.
Similar analysis, focusing on the requirement that the defendant show actual serious prejudice, has been used in State v. Manuel, 426 So.2d 140, 147-148 (La.1983) (4 month delay in drug prosecution); State v. Jenkins, 419 So.2d 463, 464-465 (La. 1982) (13 month delay in drug prosecution); State v. Crain, 379 So.2d 1094, 1096-1097 (La.1980) (6 month delay in drug prosecution); State v. Cole, 384 So.2d 374, 376 (La.1980) (2 ½ year delay in prosecution for aggravated battery); State v. Coleman, 380 So.2d 613 (La.1980) (5 month delay in drug prosecution).
In the present case the defense claims specific prejudice in having been unable to examine the site with its own experts, so as to establish that no accelerants were present immediately after the fire. More broadly, the defense argues the state could have prosecuted fifteen years earlier and the state had a duty to investigate more carefully then and to prosecute timely if it had a case. The prosecutor denied inferences that the state had been negligent or that it had not used due diligence in solving the crime. At the hearing on the motion to quash, the state offered no other evidence regarding the fifteen year pre-indictment delay.
The only basis for specific prejudice articulated by the defendant was an inability to examine the site as it existed in 1970. Yet, at trial, he was able to adduce evidence from both of the men who originally investigated the blaze, i.e., Houma Fire Chief Howard Oubre and State Fire Marshall's Investigator Robert Cass. Oubre appeared at trial and testified as to conditions he observed and tests he ran immediately after the fire and, further, as to his conclusion that its cause could not be determined. While Cass, the other investigator, was unavailable for trial, the state stipulated to the details of his written report, drafted in 1970 after about a five week investigation of the fire. In pertinent part, jurors learned that Cass found neither indication nor evidence that accelerants were used or that the fire had been intentionally set.
Consequently, and regardless of the state's reasons for delaying institution of prosecution, defendant failed to show the pre-indictment delay resulted in actual prejudice. Malvo and progeny would hold entitlement to relief on this point has not been shown. Moreover, we also agree with the following statement of the Court of Appeal:
It is quite evident that the state did not delay prosecution for fifteen years to gain a tactical advantage. Although not definitively revealed, it appears that the delay stemmed from a previous lack of concrete expert opinion characterizing the origin of the instant fire as arson. Schrader, 506 So.2d at 870.
Finally, and of crucial importance in evaluating the state's reasons for delaying prosecution, we note that neither of the witnesses who overheard defendant's threats *1029 to burn down the house came forward with their information until long after the fire. One was Judy Smith Griffith, a sister of the victim in the case. Defendant was at Judy's parents' home Halloween night and it was there that Judy overheard defendant tell his wife that "if she [were] at the house when he [got] there, he [would] set it on fire...." Yet, the first time Judy talked to authorities was after defendant's arrest in 1985. Prior to that, she "just kept telling [her parents]" of her suspicions.
At any rate, the other witness to testify about defendant's threats was Harold Foret. Foret was at defendant's home on Halloween day and there witnessed an altercation between defendant and his stepson, Tommy. Defendant slapped Tommy and told his wife he was going to burn the house down. Foret left with Tommy; when they returned later that evening, the house was burning. In addition, Foret related details about an essentially identical altercation between defendant and Tommy occurring two weeks prior to Halloween. Like Judy Smith Griffith, however, Foret kept this information to himself for over fifteen years.
For the foregoing reasons, we conclude the fifteen year delay in prosecution did not deprive the defendant of due process. This assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER THREE
We agree with the Court of Appeal's analysis of this assignment of error.
Defendant complains because the trial court refused to admit him to bail pending trial of the instant offense. In response to defendant's motion to set bail, the trial court conducted a hearing, concluding that Louisiana Code of Criminal Procedure article 313, which governs bail for capital offenses, was applicable. In refusing to set bail, the trial court found that defendant, who had been indicted for the instant offense, failed to establish that proof was not evident or the presumption was not great that he was guilty of the instant offense. It appears the defendant may have been bailable given the judicial invalidation of the death penalty portion of the Louisiana murder statute in effect at the time of the instant offense. See State v. Polk, 376 So.2d 151 (La.1979); State v. Foat, 428 So.2d 474 (La.1983). However, because there has been a trial and conviction, the bail issue is moot and will not be reviewed on appeal. See State v. Rester, 309 So.2d 321 (La.1975).

Schrader, 506 So.2d at 871.
The time to complain about bail is before conviction, not after. La.C.Cr.P. art. 322; State v. Simmons, 414 So.2d 705 (La.1982); State v. Malvo, 357 So.2d 1084 (La.1978). Accordingly, there is no merit to this assignment of error.

ASSIGNMENT OF ERROR NUMBER FOUR
By this assignment of error, defendant argues the trial court erred in allowing the state to amend its answer to defendant's motion for a bill of particulars on the morning of trial. At the time of the offense, R.S. 14:30 provided that first degree murder was either: (1) a specific intent homicide; or (2) a homicide committed during the course of certain enumerated felonies, including aggravated arson. Acts 1942, No. 43. The indictment returned by the grand jury charged the defendant with the first degree murder "in violation of La.R.S. 14:30," without designating the appropriate subsection. In its answers to counsel's bill of particulars, the state then informed the defense that the defendant had committed the offense "while engaged in the perpetration of aggravated arson...." The state also informed counsel that it was proceeding under R.S. 14:30(1). On the day of trial, the state sought to amend its answers to reflect that defendant had violated R.S. 14:30(2) "[j]ust to clarify the record." Counsel immediately protested that he had "... been expecting him to prove intent. Now he's telling me he doesn't have to prove intent." The trial judge allowed the amendment.
The defense was clearly entitled to know under which subsection of R.S. 14:30 the state was proceeding. State v. Huizar, *1030 414 So.2d 741 (La.1982); State v. Rogers, 375 So.2d 1304 (La.1979); State v. Johnson, 365 So.2d 1267 (La.1978). Nevertheless, as set forth in State v. Unzueta, 337 So.2d 1102, 1103-04 (La.1976), "[w]hile the bill of particulars is intended to assure the defendant a full understanding of the charge in order that he might, in fairness, properly defend himself, it was never intended as a trap for the unwary district attorney. It is for this reason that Article 485 of the Code of Criminal Procedure permits the district attorney to cure a defect in a bill of particulars." The First Circuit relied on Unzueta in denying defendant relief on this point. See, Schrader, 506 So.2d at 871. Of course, Art. 485 addresses only those defects which might give rise to a motion to quash, not erroneous answers which may mislead counsel and impair preparation of the defense. In this case, however, the state had clearly informed counsel of how it intended to prove its case. The question of intent was a matter of inference arising from the circumstances of the case, if the state chose to make the argument at trial. R.S. 15:445. The apparent discrepancy in the state's answers should have alerted counsel that the prosecution had simply referred to the wrong subsection of the statute. In any event, the defense efforts to subpoena its own arson expert for trial show clearly that counsel knew exactly where the issues would be joined at trial and that the state's answers as a whole fairly informed the defendant of the nature of the charge against him.
For the foregoing reasons, this assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER FIVE
By this assignment of error, defendant argues the trial court erred in denying his motion for a continuance filed the day before trial. Defendant sought a continuance in order to obtain the testimony of Mr. Robert Cass, an expert witness for the defense. Although Mr. Cass was unavailable despite defense counsel's efforts to have him at trial, the prosecution agreed to stipulate as to what Mr. Cass's testimony would be. Moreover, Mr. Cass, a representative of the State Fire Marshall's office, investigated the fire scene with former Chief Howard Oubre of the Houma Fire Department. Mr. Oubre did testify for the defense.
We agree with the Court of Appeal's analysis of this assignment of error.
As a general rule, the denial of a continuance is not grounds for reversal absent an abuse of discretion and a showing of specific prejudice caused by denial of the continuance. State v. Roy, 496 So.2d 583 (La.App. 1st Cir.1986). Louisiana Code of Criminal Procedure article 710 provides that, when a motion to continue is based on the absence of a material witness, it may be denied if the adverse party admits that if the witness were present he would testify as stated in the motion. In addition, the trial court may also require the adverse party to admit the truth of the testimony.
The trial court did not abuse its discretion in this instance. Because of the stipulation, the facts contained in the defense motion were presented to the jury. In addition, Mr. Cass' co-investigator, Chief Oubre, testified for the defense.
Accordingly, this assignment of error is without merit.
Schrader, 506 So.2d at 871-2.

ASSIGNMENT OF ERROR NUMBER EIGHT
By this assignment of error, defendant argues the trial court erred in admitting the testimony of Judy Smith Griffith, the victim's sister, despite the state's failure to list her name in its answers to discovery. Smith, who was 13 years old in 1970, had witnessed an argument between defendant and Audrey Schrader in her mother's home on Pecan Street, near Garnet Street in Houma. The argument took place at approximately 8:00 p.m. on Halloween night. Griffith had not paid "too much attention about it," but did overhear defendant tell his wife that: "if she be there at the house when he get there, that he's going to set it on fire." Later that evening, *1031 Griffith's sister left to spend the night on Garnet Street and then perished in the blaze. Counsel protested that the state had not given him Griffith's name in discovery and had made no mention of her at the hearing on the motion to suppress.
Both points were correct, but the state had, at the least, given notice in its discovery answers that it would introduce "certain oral statements made to Audrey Schrader on or about 8 o'clock p.m., October 31, 1970, at 629 ½ Pecan Street, Houma, Louisiana." La.C.Cr.P. art. 716(B) did not require the state to disclose the contents of the statement and the prosecutor was therefore in literal compliance with the discovery articles. As he argued at trial, "[a]ll the law says is [that] I got to tell him who the statement was made to. I don't have to tell him who heard it...."
In any event, the defense counsel tore into Griffith on cross-examination and established that while the witness had had her "suspicions" about the defendant, she had voiced them only to her immediate family, and did not mention the conversation between defendant and his wife to the authorities for over 15 years. Counsel was therefore able to capitalize on a central weakness of the state's case with regard to its "threat" or motive evidence. Counsel had, of course, been informed by the state's answers that he would have to face evidence with regard to the conversation between defendant and his wife in that house on Pecan Street. In his own testimony on direct, defendant conceded that he had quarreled with his wife at the Smith residence (although he equivocated on when the argument took place), and that he "might have" threatened to burn the house on Garnet Street down "when we was drinking." Even if surprised by the identity of the witness to the statements, counsel cannot show under these circumstances that the preparation of the defense had been significantly prejudiced.
For the foregoing reasons, this assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER NINE
By this assignment of error, defendant argues the state's discovery answers misled him with regard to the date on which defendant slapped Tommy LeBlanc at the fish fry and stated to Harold Foret that he would burn the house down. In its supplemental answers to discovery filed on January 18, 1986, or four months before the hearing on the motion to suppress, the state placed the date of defendant's statement to Foret "on or about October 17, 1970." In his testimony at both the hearing on the motion to suppress and at trial, however, Forest proved a terrible witness for the prosecution. When asked by counsel at the hearing how he knew the fish fry had taken place on October 17, 1970, Foret replied: "That's when the house burnt down, that night ... I know it was that day before the, the house burnt down ... Day before or week before. I'm not sure."
At trial, the source of Foret's confusion became clear. According to the witness, he had seen defendant slap Tommy, and heard him make the threat to burn down the house, on two occasions: once at the fish fry; and again during another fight on Halloween day. When confronted by counsel with his testimony at the suppression hearing, Foret conceded, "I got messed up... See, I don't know how to read and write."
Counsel pointed out the discrepancy between the witness's testimony and the state's discovery answers to the trial court and argued that "as far as prejudice, if the threat was made on the day of the fire, it would be more prejudicial than if it was made two weeks before the fire." "I think," the trial judge observed in denying the motion for a mistrial, "the operative part is that defendant was aware that this statement had been made. Whether or not fourteen days would prejudice this defendant, I don't know ... [Foret] may in fact have heard this statement, also, on the seventeenth."
It seems clear from the confused nature of Foret's testimony that the state did not deliberately mislead counsel with its discovery answers. In addition, with Foret, as with Judy Smith Griffith, counsel *1032 managed to devastate the witness on cross-examination. As an alternative to a mistrial, the prosecutor suggested that if Foret was "wrong about the date, then the learned counsel for the defendant can expose those errors and impeach him with his prior inconsistent statement." Counsel proved adept at the impeachment and established that Foret had also come forward with his information only "two or three weeks" before defendant's trial. Cross-examination ended with the following exchange:
Q. Why did you wait fifteen years to do this?
A. I don't know.
Q. Didn't you think it was important?
A. No, not at the time.
Q. You didn't think it was important at the time? You didn't think it was important because you didn't ... really consider it a threat. Isn't that right?
A. Yes, sir.
As with Judy Smith Griffith, the state's discovery answers, misleading or not, had no apparent effect on counsel's ability to cross-examine the witnesses successfully. Counsel made no argument below, and does not make one here, that the state had deliberately deceived him with regard to the strength of its case and led him to forgo any attempt at negotiating a favorable plea bargain. Compare, State v. Mitchell, 412 So.2d 1042 (La.1982); State v. Davis, 399 So.2d 1168 (La.1981); State v. Meshell, 392 So.2d 433 (La.1980). Under these circumsances, counsel has also failed to show here significant prejudice arising out of any discovery violation. Accordingly, this assignment of error lacks merit.

ASSIGNMENTS OF ERROR NUMBERS TEN AND ELEVEN
By these assignments of error, defendant complains about two hearsay rulings by the trial court during the testimony of defense witness, Howard Oubre, the fire chief of the Houma Fire Department at the time of the blaze on Garnet Street. Oubre had been unable to come to any firm conclusion about whether the fire had been set deliberately. He could not, for example, detect any inflammable or explosive vapors with the aid of a so-called explosion meter. In an attempt to underscore the Chief's equivocal results, counsel sought to ask Oubre whether he was "able to learn or determine any witnesses who saw the defendant at the scene of this fire before it was started." The prosecutor immediately protested that the question called for a hearsay, and the trial court sustained the objection.
In order to avoid any suggestion of hearsay, counsel should have asked Oubre whether any witnesses said they saw the defendant at the scene of the fire before it started. As the First Circuit noted in its opinion, "[a] witness is generally competent to testify that a statement was made so long as no attempt is made to vouch for the credibility of its contents." Schrader, 506 So.2d at 873; see, State v. Ford, 368 So.2d 1074 (La.1979). Nevertheless, the First Circuit was clearly correct that the error was harmless. The principal investigator of the fire back in 1970 was Robert Cass, the missing defense expert. According to the stipulation read to the jurors without objection, Cass had "questioned numerous witnesses to the fire, and he could not locate any witness who saw the defendant near the fire before it started, or after."
In his cross-examination of Oubre, the prosecutor made use of a treatise written by Richard Safferstein, Ph.D. in forensic chemistry with the New Jersey State Police. Over counsel's hearsay objection, the state sought and obtained Oubre's agreement with the opinion of Safferstein that an explosion meter "is not a conclusive test for a flammable vapor, but it does provide the investigator with an excellent screening device for checking suspect samples at the fibers." The First Circuit could find only one case in this Court supporting its view that "[i]n Louisiana, cross-examination of an expert witness by reference to scientific authorities is generally sanctioned for the purposes of testing the expert's knowledge, background, and accuracy." Schrader, 506 So.2d at 873; see, State v. Gambino, 362 So.2d 1107, 1112 (La.1978), cert. denied, 441 U.S. 927, 99 *1033 S.Ct. 1041, 59 L.Ed.2d 87 (1979). In turn, Gambino simply adopted the per curiam remarks of the trial judge regarding this general practice. A more reliable source might have been 6 Wigmore, Evidence § 1700 (Chadborn rev. 1976):
The use of treatises on cross-examination of [expert witnesses] is allowed [as an exception to the hearsay rule] under more or less restrictive conditions. Thus, many courts allow the cross-examination only when the witness has stated, either on direct or on cross-examination, that he relies on the treatise. Others dispense altogether with the necessity for the witness' reliance and require only that he acknowledge the treatise as an authority. A few progressive courts permit use of the treatise, even without the witness' acknowledgement, provided, of course, its authoritative quality is established by some means, such as judicial notice.
In this case, the prosecutor's cross-examination failed under these standards, as Oubre had never heard of Safferstein. The state had therefore ventured on shaky ground. This exception to the hearsay rule rests in part on the assumption that learned treatises are trustworthy sources of information. "They may have a bias in favor of a theory," Wigmore notes, "but it is a bias in favor of the truth as they see it; it is not a bias in favor of a lawsuit or of an individual." 6 Wigmore, supra, § 1692. Nevertheless, counsel voiced only a general hearsay objection to the question, and backed away from even that complaint when the prosecutor asked him, "Well, what's the difference if I make it up or ask him from the book?" Counsel had no answer for that, and died on his own objection: "Well, okay. I objected. I'm sorry. Go ahead." He thereby failed to state the proper grounds for his objection and cannot now complain of the court's ruling.
For the foregoing reasons, these assignments of error are without merit.

ASSIGNMENT OF ERROR NUMBER TWELVE
By this assignment of error, defendant complains the trial court erred in allowing the prosecutor to cross-examine defendant about the details of a civil suit he had filed aginst J.G. Duplantis, the owner of the Garnet Street house, in 1978. That suit had led defendant to his present difficulties, as it occasioned a second look at the charred remains of the house by the state's star expert witness, Harold Myers, who had been hired by Duplantis. In his direct testimony, defendant admitted that he had quarreled with his wife over at the Smith home earlier on Halloween day, and then left at approximately 6:00 p.m. for the push boat where he worked as a wheelman and where he spent the night. According to defendant, "[t]hat night it was [the captain's] turn to go home. So I stayed on the boat." Under cross-examination, however, he began equivocating about whether the quarrel with Audrey had taken place on the day of the fire. The prosecutor immediately produced the deposition given by defendant in 1978 as part of the civil litigation. On that occasion, defendant explained that he had slept on the push boat Halloween night "[b]ecause the wife and I had one of those family, what you call little family arguments." Counsel protested that the details of the civil suit were irrelevant, but the prosecutor clearly had the right to impeach defendant with his prior inconsistent statements. R.S. 15:493. As the First Circuit noted, the relationship between defendant and his wife was not a collateral matter but lay at the heart of the case. State v. Schrader, supra, 506 So.2d at 874. Thus, this assignment of error is without merit.

ASSIGNMENTS OF ERROR NUMBERS THIRTEEN AND FOURTEEN
By these assignments of error, defendant says that his conviction is contrary to the law and evidence. Defendant argues a new trial should have been granted because the evidence adduced at trial did not warrant a finding of guilty of manslaughter. In his view it was obvious that the jury felt that there was not sufficient evidence that defendant set the fire and, thus, that he was guilty as charged of murder. The appellate court, citing applicable jurisprudence, *1034 found complaints about the jurors' "compromise" verdict without merit, particularly where defendant had failed to object timely to inclusion of manslaughter as a responsive verdict.
The appellate court was correct insofar as it held that, absent a contemporary objection, a defendant may not complain if jurors return with a legislatively approved responsive verdict, whether or not that verdict is supported by the evidence. This Court has indicated that such a result both recognizes the legitimacy of a "compromise" verdict and comports with the responsive verdict scheme of La.C.Cr.P. art. 814. State ex rel. Elaire v. Blackburn, 424 So.2d 246 (La.1982). However, and as Elaire made clear, there is an important proviso to this rule: the evidence must be sufficient to sustain a conviction on the charged offense. Id. at 251. In terms of this case unless the prosecution showed the child's death was something other than a tragic consequence of an accidental fire, it was not entitled to defendant's conviction on any grade of homicide. Thus, while defendant's complaint may not have been well-articulated, it can be construed as a challenge to the sufficiency of the evidence on the charged offense (i.e., murder). We find, however, that the evidence was sufficient to find the defendant did set the fire which resulted in Catherine Smith's death.
In an effort to prove the fire was in fact the result of arson, rather than simply an accident, the state's first expert was Harold Myers, a consulting engineer since 1961 and employed by Haag Engineering Company for twelve years. The firm specialized in "damage and failure analysis engineering" with perhaps seventy-five percent of its work involving determination of the cause and origin of fires. Myers holds a degree in mechanical engineering, and is a member of the National Fire Protection Association and the American Society of Fire Investigators. He is a registered professional engineer in mechanical and electrical engineering in Mississippi and has been accepted as an expert in the cause and origin of fires in both federal and state courts throughout Louisiana. Without objection, the trial court accepted the witness as an expert in investigation of the cause and origin of fire.
Myers testified he was hired by the attorney who represented the property owner in the civil suit filed by the defendant. On January 3, 1978, he traveled to Houma and, in the company of the attorney and Duplantis, examined the premises at 502 Garnet for approximately 2 hours. He also reviewed photographs taken of the house after the fire. In addition, he had access to depositions taken in connection with the suit.
The witness explained that the cause and origin of a fire are determined by studying its characteristics such as its pattern of damage, burning, charring, heat and temperature, against what experience with fires has taught. For example, most accidental fires usually start at a single point and spread slowly outward and upward in a "V" burn pattern, with the greatest damage found near the point of origin. Smoke collects above that point and settles slowly to the floor, with its passage marked by "smoke-lines" on the walls. The particular kind of heat produced by a slow-building fire generates a "large flat alligatoring," or buckling, on the exterior of a wooden house such as the one in this case. By contrast, a non-accidental fire would have separate, perhaps multiple, points of origin and damage would be uniform, rather than decreasing from one central point. If a fire had been "accelerated" through the use of flammable liquids, a different kind of heat and burn pattern is produced. For example, a "much smaller charring or alligatoring" pattern is found on exterior surfaces.
Continuing his testimony, Mr. Myers referred to the 1970 photographs and pointed to those of the exterior of the house. The pictures, he testified, showed an "almost identical" degree of damage in several areas of the house. This led him to believe the fire was not concentrated in one room. The photographs, as well, reflected the "smaller charring" or alligatoring typical of a rapid fire. Other pictures showed holes burned completely through the one *1035 inch wooden floor. In the witness' view, since the floor is usually the coolest place in a fire, this kind of damage pattern indicated the fire had "to have some help," such as "a flammable liquid of some sort" being poured over the flooring in these spots. Still other photographs showed "smoke [lines] go[ing] all the way to the floor in almost every room."
Mr. Myers found no evidence of a fire caused by explosion. Aware that the civil suit contained an allegation of faulty wiring, the witness examined what remained of the house wiring but could find no evidence that the electrical system caused the fire. While the air conditioner, dryer, refrigerator, and freezer (shown in the photographs) were all gone from the house, the witness excluded those appliances as possible sources of the fire, indicating different burn patterns would have been produced had such been responsible for the blaze. With regard to the air conditioner and dryer particularly, Mr. Myers pointed to the photographs which showed undamaged wood around the window containing the unit and to the undamaged clothes, "laying in front of [the dryer]." Elsewhere, the witness explained "beading" of an electrical wire as a physical change induced by heat, as from a short-circuit and arcing of the electricity over the wire. In his view, even if larger sized fuses had been installed, the amount of electrical surge required to produce beading would have triggered any fuse/circuit breaker and, thus, cut off the power to the house. While Myers was unable to say whether this fire had multiple points of origin, he did class it as one which moved "rapidly" from room to room. Based on the foregoing, the witness concluded that this fire, "in all probability," had been "intentional[ly] set" and aided through the use of "some flammable liquid," such as gasoline.
Under cross-examination, the witness acknowledged he could not have found residue of flammables after so long a time, nor had he expected to, given their volatile nature. He conceded, therefore, an inability to say positively that gasoline was used or that the burn patterns he observed were produced by a fire on October 31, 1970. Elsewhere, Mr. Myers said his opinion would not change by the fact that investigators first on the scene used detection devices for analyzing for the presence of flammables and that the tests results had been negative. The witness explained devices such as "explosion meters" and "hydrocarbon meters" were notoriously unreliable and, in fact, Mr. Myers placed far more credit in what his "nose" told him of the gases in the ambient air near a fire. Later, the witness reiterated his opinion that this fire had not been caused by faulty wiring, an electrical short-circuit or by wire failure.
The state's second expert was Jimmy Barnhill, a forensic chemist employed by the State Crime Lab. Unlike Myers, the defense objected to Barnhill's qualifications. Nevertheless, the witness was accepted as an expert in the fields of analysis of fire scene material and in the cause and origin of fires.
Barnhill examined the house September 5, 1985, for approximately three and one-half hours. He, like the expert before him, had access to the 1970 photographs. What caught Barnhill's attention, and formed the basis for his conclusions, was the "irregular [burn] patterns" on the wooden floor. Had the entire floor been "uniformly burned," he "would not have suspected [the use of] any accelerants." Instead, the burn patterns suggested that "an accelerant had been poured in the door into what was the dining room, and also in the doorway between the kitchen and the living room...."
Although Barnhill knew, as did Myers, that the presence of flammables could not be detected after so long a time, nevertheless, he took several samples from the floor and subjected them to capillary gas chromatography and mass spectrometer testing, with negative results.
The witness' conclusions echoed those of Myers'. Barnhill believed that the damage, as reflected in the burn patterns, was inconsistent with an accidental fire. The witness believed that a rapid, intense heat had filled the house, peeling paint from the *1036 ceilings and charring woodwork yet, at the same time, allowing plastic toys to survive the fire without damage or heat distortion. Barnhill ruled out an explosion, saw "no evidence" of an electrical fire, and put no trust in test results from hydrocarbon/flammable vapor detectors. Unlike Myers, Barnhill believed there were at least two points of origin of the fire. Based on the burn pattern found in the living room, kitchen and dining room, the witness concluded the fire had been intentionally started and that accelerants had been used. On cross-examination, Barnhill testified that the chromatography and spectrometer tests were available in 1970.
This evidence, although challenged to some extent by the defense's experts, we find to have been sufficient to find the fire was the result of arson. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). A rational trier of fact could find beyond a reasonable doubt that the fire was not accidental.
Other evidence pointed to the defendant as arsonist. As noted above, two witnesses testified the defendant threatened to burn down the house. Also, the state offered testimony from gas station attendant Teddy Lee Matherne that defendant purchased gasoline on the night of the fire. Matherne testified defendant came in around 7:30 or 8:00 p.m. on the night of the fire saying he was trying to fix a lawn mower and, for that reason, purchased "some gas in a small can." We find that this evidence would allow a rational trier of fact to conclude beyond a reasonable doubt that defendant was the arsonist.
For the foregoing reasons, these assignments of error are without merit.

ASSIGNMENT OF ERROR NUMBER FIFTEEN
By this assignment of error, defendant argues that his sentence of twenty-one years at hard labor is excessive. Defendant argues the fire took place over fifteen years ago and there is no undue risk that the defendant will commit another crime when he is released.
At trial, however, defendant admitted he had been previously convicted of aggravated assault with intent to kill with a shotgun and had three other assault convictions. As the Court of Appeal properly noted, a trial court has wide discretion in the imposition of sentences within statutory limits. Schrader, 506 So.2d at 875. Given the jury's finding that the defendant's actions took the life of an innocent young girl by setting the fire, we cannot say the trial court abused its discretion or the penalty imposed was so clearly disproportionate that it shocks the conscience. State v. Williams, 448 So.2d 659 (La.1984); State v. Bonanno, 384 So.2d 355 (La.1980).
Accordingly, this assignment of error lacks merit.

JURY SEQUESTRATION
In a long series of cases this Court has held where a capital jury is not sequestered, this Court may take cognizance of the lapse on its own motion. Further, we have held such an error mandates reversal. State v. Parker, 372 So.2d 1037, 1038 (La. 1979); State v. Rich, 368 So.2d 1083, 1085 (La.1979); State v. Martin, 329 So.2d 688, 690-1 (La.1976); State v. Luquette, 275 So.2d 396 (La.1973).
Our review of the record in this case reveals the jurors were not sequestered during the trial of this case. It is true that defendant could not have been sentenced to death due to the constitutional infirmities of the statutes in place at the time of the homicide. Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); see also, State v. Collins, 370 So.2d 533 (La.1979). Nevertheless, this homicide prosecution retained for procedural purposes its "capital" classification. Thus, prior jurisprudence would indicate defendant was entitled to the protections afforded the accused in a capital case, including a sequestered jury. See, State v. Rich, supra; State v. Hunter, 306 So.2d 710, 711 (La. 1975); State v. Flood, 263 La. 700, 705, 269 So.2d 212, 214 (1972); State v. Holmes, 263 La. 685, 688, 269 So.2d 207, 209 (1972).
Although defendant did not object to this error or urge it on appeal, the error is *1037 considered by this court since it is an error discoverable by a mere inspection of the record. La.C.Cr.P. art. 920(2); State v. Wiggins, 432 So.2d 234 (La.1983); see also, State v. Upton, 382 So.2d 1388 (La.1980); State v. Jones, 341 So.2d 3 (La.1976).
We now hold, despite its long lineage, the jurisprudential presumption of prejudice for "capital cases" does not apply to a "capital case" where the defendant never faced the prospect of the death penalty and where counsel failed to press the point in the trial court, or object to the lack of sequestration. In the absence of actual prejudice, this right to sequestration is waived.
The record does not indicate that counsel requested sequestration of the jurors, or that he objected when the trial court sent them home for the night at the close of the first day of trial with a mild admonition "do not read the daily newspaper ... do not listen to a local radio station ... in the event that there is [any publicity] about this trial, I don't want you exposed to it." For all that appears, defense counsel agreed completely with the trial court's decision.
As already mentioned, this Court has consistently treated significant sequestration violations as reversible error, whether or not counsel objected to them, and whether or not the defense acquiesced in the mistake. See, State v. Parker, 372 So.2d 1037 (La.1979); State v. Luquette, 275 So. 2d 396 (La.1973); State v. Craighead, 114 La. 84, 38 So. 28 (1905). This line of cases stretches back well over one hundred years to State v. Hornsby, 8 Rob. 554 (1844), and State v. Costello, 11 La.Ann 283 (1856). In Costello, for example, the defendant made a written waiver of sequestration on the first day of his trial for murder. On the following day, the state objected to the lack of sequestration and the trial court declared a mistrial. After a second trial before another jury, the defendant was found guilty as charged. In rejecting the defendant's argument that double jeopardy barred the second trial, this Court held that the sequestration error at the first trial amounted to "manifest necessity," requiring discharge of the jury, and therefore did not bar retrial. Cf., Illinois v. Somerville, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973). As this Court noted in State v. Luquette, "[i]mproper impressions may and will be made upon [the] minds [of the jurors] by artful and designing men, of which they may be perfectly unconscious; neither can they shut their eyes to the expression of popular opinion. In capital cases, upon a separation, misconduct and abuse will always be presumed." Luquette, 275 So.2d at 400.
This Court's presumption of prejudice began with State v. Hornsby, supra, a case in which the jury returned a verdict of manslaughter on a charge of (capital) murder and the defendant received a sentence of 5 years at hard labor. (This information is not reflected in the Hornsby opinion itself but comes from the archival resources at the University of New Orleans, now the home for this Court's earliest decisions.) The fact that the defendant had been insulated from the death penalty by the jury's verdict did not prevent the Court from reversing his conviction. On the other hand, in a case where the defendant never faced the prospect of a death sentence, there is no more reason to presume prejudice from the trial court's failure to sequester the jurors than in any other serious felony prosecution. While a defendant may take advantage of the "classification theory" to insist on sequestration under these circumstances, his failure to object amounts to a waiver of the error. In State v. White, 404 So.2d 1202, 1204-5 (La.1981), we stated:
[A]n error in procedure which does not affect the fundamental fairness of the process does not necessarily require reversal and remand, unless prejudice is shown. C.Cr.P.Art. 921. In fact, C.Cr.P. Art. 921 mandates that this court not reverse a judgment because of an "error, defect, irregularity or variance which does not affect substantial rights of the accused".
We accordingly hold that there is no need to equate errors discoverable on the face of the pleadings and proceedings with reversible error. Whether a patent *1038 error, like other statutory error, requires reversal must be evaluated in light of the potential impact on the fairness of the proceedings.
In the present case the defendant did not object to the lack of sequestration. Moreover, the potential impact on the fairness of the proceedings was no greater than for non-capital cases. It is true that the case remained "capital" under the procedural classification of our statutes; however, it was in fact not capital in the sense of the cases such as Parker and Luquette wherein this court presumed prejudice. That is, the defendant did not face the death penalty, nor did the jury face the heightened pressure inherent in having to consider the death penalty. Accordingly, the failure to sequester the jury in this case was not reversible error.

CONCLUSION
We find no merit in the defendant's assignments of error. We also find that failure to sequester the jurors in this case does not mandate reversal.
AFFIRMED.
CALOGERO, J., dissents and assigns reasons.
CALOGERO, Justice, dissenting.
Defendant was charged with murder, and the grand jury returned a responsive verdict of manslaughter. Under the standard ennunciated by Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), a criminal conviction should be reversed if the reviewing court, after considering the evidence in the light most favorable to the prosecution, finds that a rational trier of fact could not have found beyond a reasonable doubt that the defendant committed the essential elements of the crime. As noted by the majority opinion, the evidence must be sufficient to convict on the offense charged, murder. State v. ex rel. Elaire v. Blackburn, 424 So.2d 246 (La.1982). Applying the Jackson standard to this case, I believe that the evidence was insufficient to support a murder conviction, and thus the responsive manslaughter verdict is invalid.
The state's evidence against the defendant consisted of: (1) the testimony of experts retained by the prosecution that the fire was, in their opinion, intentionally set; (2) the testimony of two lay witnesses who allegedly heard the defendant threatening, shortly before the fire, to burn down the rental house in which he and his family lived; and (3) the testimony of a gas station attendant that defendant purchased gasoline in a small can on the evening of the fire. The issue is whether a reasonable jury could conclude beyond a reasonable doubt, based on this evidence, that the defendant burned down the house.
Because Jackson requires that the evidence be considered in the light most favorable to the prosecution, I disregard for the purposes of sufficiency analysis the fact that the credibility of the referenced lay testimony was highly questionable. As the majority notes, the witnesses who recounted defendant's alleged threats were "devastated" on cross-examination, primarily because they could not adequately explain why they did not come forward with the information that they possessed for some fifteen years. Similarly, the gas station attendant could not explain why he waited fifteen years to disclose to the authorities what he knew, even though he knew that there had been a fire at defendant's home on the night that the gasoline was allegedly purchased. I will also disregard here the fact that there was seriously conflicting expert testimonythe experts who examined the scene immediately after the fire occurred were unable to reach a conclusion as to its origin, while the state experts who visited the scene years later concluded that the fire was intentionally set. For sufficiency of evidence purposes, I will assume that a reasonable jury could have believed the lay witnesses, despite their credibility problems, and could have accepted the testimony of the state expert witnesses over the defense experts.[1]
*1039 Even operating under those assumptions, I do not believe that the state presented sufficient evidence for a jury to conclude beyond a reasonable doubt that the defendant burned down the house. The threats and the gasoline purchase may constitute incriminating evidence, but they do not exclude every reasonable hypothesis, or possibility, that the defendant was not the person who set the fire. There was no physical evidence or testimony which placed the defendant at the scene of the fire. Nor could any expert witness state with certainty that gasoline was used to ignite or accelerate the fire, and if so, the amount of gasoline which would have been required for that purpose. In my opinion, the evidence is insufficient to support the conviction because of the absence of evidence directly linking defendant to the cause of this fire.
Accordingly, I dissent from the majority opinion; I would reverse the defendant's conviction on the ground that it is not supported by sufficient evidence.
NOTES
[1] I do question the trial court's refusal to allow the defendant a continuance in order that one of the defense experts would be available for trial and able to present live testimony. Although granting a continuance for this purpose and delaying the case for only a matter of weeks when the prosecution had already been delayed for 15 years would not have been unreasonable, I am not prepared to say that the trial court's refusal to do so constitutes reversible error.