# STATE OF LOUISIANA

# COURT OF APPEAL

# FIRST CIRCUIT

## 2019 KA 1027

## STATE OF LOUISIANA

## VERSUS

## JASON W. THOMAS

Judgment Rendered:  FEB 2 1 2020

Appealed from the
Twenty-Second Judicial District Court
In and for the Parish of St. Tammany
State of Louisiana
Docket Number 563809

Honorable William J. Knight, Judge Presiding

*************

| | |
|---|---|
| Warren L. Montgomery<br>Matthew Caplan<br>J. Bryant Clark<br>Covington, LA | Counsel for Appellee,<br>State of Louisiana |
| Patricia R. Fox<br>Covington, LA | Counsel for Defendant/Appellant,<br>Jason W. Thomas |

*************

BEFORE: WHIPPLE, C.J., GUIDRY, AND LANIER, JJ.

**WHIPPLE, C.J.**

Defendant, Jason Thomas, was charged by bill of information with two counts of indecent behavior with a juvenile, violations of LSA-R.S. 14:81(A).[1] He pled not guilty. After a trial by jury, defendant was found guilty of two counts of the lesser included offense of attempted indecent behavior with a juvenile. See LSA-R.S. 14:27 and 81(A). The trial court imposed concurrent terms of three-and-a-half years imprisonment at hard labor, with two years suspended. Defendant now appeals. For the following reasons, we affirm the defendant's convictions and sentences.

## STATEMENT OF FACTS

In March 2015, E.A.[2] and her father entered the St. Tammany Parish Sheriff's Office to file a complaint for crimes defendant perpetrated against E.A. between late 2010 and 2013 in Pearl River, Louisiana. At trial, E.A. described her relationship with defendant, her maternal grandfather, detailing frequent visits to her maternal grandparents' home in St. Tammany Parish, where she enjoyed fishing and hunting with her "pawpaw." She explained that her sisters did not enjoy doing those activities as much as she did, so she developed a closer bond to her grandfather than they did, was treated differently than they were, and considered herself his "favorite." Defendant never missed E.A.'s softball games, would purchase her sports equipment, and would travel to watch her play. He would sometimes bring her to and from games when her parents could not make the games.

E.A. noticed defendant "looked at [her] different" after she turned 13. To her, his "tone" had changed, as well as how he talked to her, and she noticed him

---

[1]Specifically, defendant was charged with violating LSA-R.S. 14:81(A) with respect to W.A. for acts committed between August 27, 1990 and August 26, 1992, and with respect to E.A. for acts committed between December 3, 2010 and December 3, 2013.

[2]E.A. was born on December 3, 1996.

2

frequently looking down her shirt when she was at his home. He began to make comments to her regarding her breast development, would say how he liked her buttocks, would grab her daily, and would pull her onto his lap.

E.A. also explained how several inappropriate photos of herself came to be found on defendant's computer. She stated that she would take selfies in a tank top and shorts and post the photos to her social media accounts. She further acknowledged sending swimsuit photos to a couple of male friends from school and a nude photo to one of those friends. The friends were the same age as E.A. She was grounded by her parents for some of her social media posts and the nude photo. Despite being told that E.A. was grounded and not allowed to use the computer, defendant allowed her to use the computer at his home. However, when defendant learned of the nude photo E.A. had sent, he "came up with a contest" to see "who was the sexiest." He showed E.A. a photograph of himself in a pair of tight underwear,[3] asked her if she liked it, and if it turned her on. He pressured E.A. to take similar photos, so she took three topless photos in his bathroom. E.A. testified that the three topless photos she took with defendant's digital camera were left on the camera and that she did not upload the photos. While E.A. admitted taking several clothed selfies and using defendant's computer to post the photos to her social media accounts, with respect to the topless photos, she stated she left the camera on the bathroom counter when she was finished taking them. Based on some contemporaneous events, she explained she was "[a]round 16" at the time these photos were taken.

Photographs recovered from defendant's computer were introduced and published to the jury. E.A. identified three topless selfies as the ones she had taken at defendant's request. In the third photo, she identified defendant's camera as the one she used to take the photos. During her initial interview with Detective Carli

---

[3]This photograph was not recovered by investigators.

Ferrell Messina, E.A. disclosed everything except the topless photos. E.A. explained that she did not initially tell Det. Messina that she had taken the photos because she was embarrassed and blamed herself.

E.A. also testified about an incident that occurred shortly after she took the topless photos when defendant asked her to "help him out" with an erection, because he and her grandmother were "not doing it anymore." E.A. further explained that Huntington's disease was prevalent in her family, that her grandmother, mother, and aunt have it, and that it can affect one's ability to walk, eat, remember things, or function independently. She noted that her "nanny" was able to physically care for herself when E.A. was a minor, but presently was unable to do so, had difficulty remembering things, and "gets things mixed up."

When E.A. was about 17, her parents caught her having sex with her boyfriend Cory.[4] Defendant became aware of this and asked her if she enjoyed it, what she liked about it, what she did not like about it, and if she would do it again. Cory began to suspect something was not right and told E.A. that "[t]here's something wrong with [defendant]." Cory did not like the way defendant "looked at her or acted around her." Eventually, Cory confronted her and demanded to know what was happening. She became emotional and disclosed to him that "something happened," and Cory gave her a week to tell her parents or else he would. About two days later, E.A. disclosed the encounters to her mother, W.A., who is defendant's daughter. It was then that E.A. and her father went to the sheriff's office.

Det. Messina suggested they make a recorded phone call to defendant to see if E.A. could get him to admit anything. The phone call was entered into evidence and played for the jury. Though he did not admit to any illegal conduct on the call, defendant did text E.A. subsequently with a message indicating he wanted to meet

---

[4]E.A. eventually married Cory.

up with her that night so he could tell her he was "sorry" "to [her] face" and that he wanted E.A. to apologize to her mother for him as well. She later conceded that it was not unusual for defendant to tell her he was sorry when consoling her for things that upset her that were not his fault.

W.A.[5] described her early childhood in Pearl River, Louisiana. She explained that as between her and her sister, defendant tended to "favor [her] slightly." She often went fishing with defendant alone on the weekend. W.A. also noticed a change in the way defendant interacted with her once she turned 13. She recounted an incident when she was sitting in their living room and defendant "flashed" her while her mother was in the shower, exposing his genitals to her. W.A. explained defendant did it four or five more times over the next month.

She also recalled a later encounter when her mother and sister were out of town. She was in the bathroom taking a bath and had locked the door. Defendant came into the bathroom and began "just randomly talking about things, nothing specific, just rambling, just looking" at W.A. while she was naked in the bath. The next day, while her mother was still out of town, defendant asked her if she knew what a French kiss was. When she responded in the negative, defendant reached over and demonstrated on her, kissing her with "full tongue." Immediately thereafter, defendant told W.A. that he was sexually attracted to her, that he should not have been, that he had a problem, and that he would discuss it with her mother, Nancy Thomas, when she returned home. W. A.'s mother returned home the next day, and that evening, W.A. was sent to stay with her grandmother. However, her parents left her at her grandmother's house for only about two days. When W.A. was 24, defendant admitted to her that he had flashed her, but denied kissing her inappropriately.

_____

[5]W.A. was born in 1978.

W.A. testified that she feels traumatized by the incidents, and she immediately believed E.A. when she disclosed what defendant had done to her. She also explained that she allowed E.A. to spend time at defendant's house because her mother promised the behavior had stopped and would not be repeated. W.A. felt guilty for not wanting her kids to visit their grandparents because her mother had done nothing wrong, and W.A. wanted the children to see their grandmother "before they didn't have that chance."[6] W.A. acknowledged she reported the incidents to a church counselor whom her "daughter was seeing," but that the incidents between W.A. and her father were not reported to the police at that time. She also admitted allowing defendant and her mother to babysit E.A. and allowing defendant to take E.A. to softball games.

W.A.'s husband confirmed that she had told him about the incidents with defendant before they were married. He also explained W.A. did not want to keep E.A. away from Ms. Thomas and that was why they allowed her to stay with defendant on occasion.

A forensic interview at the Children's Advocacy Center was not performed on E.A. due to her age at the time of the initial report of abuse. Det. Messina interviewed both E.A. and W.A., as well as defendant's wife, Ms. Thomas. Following the initial investigation, Det. Messina obtained an arrest warrant for defendant and a search warrant for his home. Investigators recovered two laptop computers from defendant's residence, as well as a Samsung cell phone from him. Defendant stipulated the photos introduced as State exhibit S-2 were recovered from the Toshiba laptop found in defendant's home, and the text messages introduced as State exhibit S-4 were found on the Samsung phone found in defendant's possession. Investigators also recovered a notebook with handwritten

---

[6]W.A. explained she was presently asymptomatic in regard to her Huntington's disease, but that her mother was having significant difficulties.

notes. One of those notes read, "I just want to be clear when I said I was sorry I ment [sic] it[.] But I do not atmit [sic] guilt of all she said." After being informed of his Miranda[7] rights and signing a waiver form, defendant provided a recorded statement to Det. Messina, which was played for the jury. Following the interview, defendant was arrested and charged.

Defendant testified on his own behalf. He denied "flashing" W.A., but did admit to "streak[ing]" or running naked through the living room in front of her. He denied doing it to sexually gratify himself or W.A. He admitted to walking in on her in the bathtub, but claimed he did not know she was in there. He denied french kissing W.A. or grooming[8] anyone. He said he felt E.A. was wearing inappropriate clothing and he was attempting to embarrass her into wearing more modest clothing by making inappropriate statements to her. He later came to regret using those words. When questioned about it, defendant also admitted to showing E.A. the photograph of "a person in their underwear." He later admitted it was a photograph of himself, but claimed he only showed it to E.A. to demonstrate his disapproval of her clothing choices.

He also said he only would pat or slap E.A.'s buttocks in a non-sexual manner. He conceded he continued doing so longer than he should have, but when asked by defense counsel if it "was just a habit," he agreed that "[m]aybe it was." He explained that when he said he had "a problem" in his video interview, he was referring to the fact that his wife of many years had left him. However, on cross-examination, defendant explained that his "problem" was with "correcting

---

[7]Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[8]At trial, a pediatric forensics medical expert described the term "grooming" as how an adult gets a child to do inappropriate and illegal things. He explained that grooming comes in two forms: (1) by the adult "grooming" his or her image to appear as a "good person" by virtue of the good acts performed for the child; and (2) by "grooming" the child to believe that he or she owes it to the adult to protect the adult and not say anything because of the things the adult has done for the child.

inappropriately." Also, when asked by the State if he had told E.A. that men were "going to find her backside attractive," defendant acknowledged that he had.

Defendant denied knowing about the photos of E.A. on his computer, how they got there, receiving them, or asking her to take them. Defendant said he never got along with Cory, did not like him, and again tried to embarrass E.A. into discontinuing sexual relations with him. Defendant asserted that he apologizes for things he is not responsible for in an effort to "make peace" and not "argue whether I'm right or wrong." Defendant did not remember telling Ms. Thomas that he had sexual feelings for W.A.

On rebuttal, the State called Ms. Thomas. After the trial court conducted a brief competency evaluation,[9] she testified that defendant had admitted he had kissed W.A. and promised that he would never do it again. She explained that W.A. was sent to live with her mother for a brief period, but that she never told the police about W.A.'s allegation. After learning of E.A.'s allegations, Ms. Thomas "felt that he was a pedophile and it was time for him . . . something to be done." She explained that while she suffers from Huntington's disease, her "memory is very well." She conceded she left her granddaughters alone with defendant at their house. Ms. Thomas felt defendant was jealous of Cory and that is why defendant did not care for him. She also explained that her relationship with defendant ended after she learned of E.A.'s claims about him.

Following Ms. Thomas' testimony, the State recalled Det. Messina to lay a foundation for introduction of a recorded statement made by Ms. Thomas some years before trial. Defendant objected to the evidence, but only on the basis of new evidence and lack of foundation. The trial court overruled the objection, stating that the video was "being offered to corroborate the testimony of the previous witness." The video was played for the jury.

---

[9]At the competency evaluation, Ms. Thomas was able to correctly identify the current President of the United States and her home address.

## ASSIGNMENT OF ERROR #1: HEARSAY/CONFRONTATION

In his first assignment of error, defendant contends the trial court erred when it admitted into evidence Ms. Thomas' video interview recorded several years before her trial testimony. Defendant contends that because Ms. Thomas' trial testimony did not mention that defendant had allegedly admitted flashing W.A., the State introduced the video to accomplish that task. Defendant asserts that the video itself "met the classic definition of hearsay[.]" Consequently, defendant claims he was unable to adequately cross-examine Ms. Thomas on her video testimony, and as a result, his right to confront witnesses was infringed. Defendant argues this infringement was caused by the fact that the video was introduced by the State through the rebuttal testimony of Det. Messina and contained statements not in Ms. Thomas' original trial testimony. Therefore, defendant could not recall Ms. Thomas back to the stand to cross-examine her on the video statements because the State subsequently rested, and there was no longer any procedural mechanism by which to have Ms. Thomas testify again.

The State argues in response that Ms. Thomas' statement was a prior consistent video statement under LSA C.E. art. 801(D)(1)(b), offered in response to defendant's contention that Ms. Thomas' memory was irreparably eroded and altered by her medical condition. Further, the State contends defendant was able to call Ms. Thomas to the stand to cross-examine her on the recording, thus resulting in no confrontation error where defendant failed to do so. Finally, given the other evidence introduced at trial, the State posits any potential error was harmless.

To preserve the right to seek appellate review, a party must state an objection contemporaneously with the occurrence of the alleged error as well as the grounds for that objection. See LSA-C.Cr.P. art. 841(A); State v. Bedwell, 2018-0135 (La. App. 1st Cir. 6/21/18), 2018 WL 3080356, at *6, writ denied, 2018-1247 (La. 1/18/19), 262 So. 3d 287, 288. Not only does an objection have to

9

be made, but LSA-C.Cr.P. art. 841(A) requires that a defendant make known the grounds for his objection, and he is limited on appeal to those grounds articulated at trial. A new basis for objection cannot be raised for the first time on appeal. State v. Duhon, 2018-0593 (La. App. 1st Cir. 12/28/18), 270 So. 3d 597, 631, writ denied, 2019-0124 (La. 5/28/19), 273 So. 3d 315; see also State v. Guy, 95-0899 (La. App. 4th Cir. 1/31/96), 669 So. 2d 517, 526, writ denied, 96-0388 (La. 9/13/96), 679 So. 2d 102 (though he objected on other grounds, defendant's failure to object contemporaneously to hearsay precludes review of hearsay issue on appeal).

At trial, defense counsel objected to the introduction of Ms. Thomas' video interview based on a lack of foundation and possibly relevance. Defendant is now raising the objection of hearsay and confrontation error for the first time on appeal, but this claim was waived by defendant's failure to contemporaneously raise this ground at trial.

### ASSIGNMENT OF ERROR #2: IMPROPER OPINION TESTIMONY

In his second assignment of error, defendant claims Dr. Scott Benton provided improper commentary on the credibility of the claims made by E.A. and W.A. According to defendant, Dr. Benton's testimony had the effect of "giving a scientific imprimatur of approval to the victims' testimony and his characterization of the defendant-appellant's conduct." The State argues defendant waived any claimed error by failing to lodge a contemporaneous objection.

The trial court accepted Dr. Benton as an expert in forensic pediatric medicine. He testified about delayed disclosure, progressive disclosure, grooming, suppression of disclosure by a victim's family, multigenerational abuse, "target child syndrome," the commonality of "sexting" among teenagers, early participation in sexual activity by children who have been abused, and partial admission by perpetrators.

10

As an initial matter, LSA-C.E. art. 702(A) provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (1) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (2) The testimony is based on sufficient facts or data;
> (3) The testimony is the product of reliable principles and methods; and
> (4) The expert has reliably applied the principles and methods to the facts of the case.

Notably, the Louisiana Supreme Court has placed limitations on this provision in that "[e]xpert testimony, while not limited to matters of science, art or skill, cannot invade the field of common knowledge, experience and education of men." State v. Young, 2009-1177 (La. 4/5/10), 35 So. 3d 1042, 1046-47, cert. denied, 562 U.S. 1044, 131 S. Ct. 597, 178 L. Ed. 2d 434 (2010) (quoting State v Stucke, 419 So. 2d 939, 945 (La. 1982)); State v. Le, 2013-0611 (La. App. 1st Cir. 11/4/13), 2013 WL 5935677, at *2, writ denied, 2013-2828 (La. 5/23/14), 140 So. 3d 724.

Testimony in the form of an opinion or inference otherwise admissible is not to be excluded solely because it embraces an ultimate issue to be decided by the trier of fact. However, in a criminal case, an expert witness shall not express an opinion as to the guilt or innocence of the accused. LSA-C.E. art. 704. Additionally, expert assessment of witness credibility is improper. State v. Foret, 628 So. 2d 1116, 1130 (La. 1993).

On cross examination, the following was asked and answered during Dr. Benton's testimony:

> Q. I want to get something right up front. Are you testifying specifically about this case or generally about the science in this field?

> A. I have no independent knowledge of the facts in this case. I have been presented with the facts in this case and, if asked a question, could discuss it, but it's the latter that he said. There are many things you may not have heard before. I'm here to educate you on the dynamics of sexual abuse as we see it, what's the science about it. I know when I started this I would never have thought what the truth was about the dynamics.

Defendant argues that Dr. Benton saying "the truth about the dynamics" indicates he was testifying regarding the specifics of the instant case and the credibility of E.A. and W.A. However, when viewed in context and in its entirety, Dr. Benton's meaning is clear. He was testifying that it is his job to discuss the generalized factors present in cases of abuse, especially relating to delayed disclosure, and there was nothing in his testimony that addressed any claim raised in either E.A. or W.A.'s testimonies. At no time did Dr. Benton issue an opinion as to their credibility or the ultimate truth of whether what they said happened occurred. Therefore, regardless of whether counsel lodged a contemporaneous objection, there was no error for which counsel could have objected. This claim also lacks merit.

## ASSIGNMENT OF ERROR #3: INSUFFICIENT EVIDENCE/RESPONSIVE VERDICT

In his final assignment of error, defendant argues the verdict of guilty of two counts of the lesser included offense of attempted indecent behavior with a juvenile is not supported by the evidence. In his view, either the jury believed the testimony of E.A. and W.A. that defendant committed the charged offenses, or the jury believed the testimony of defendant that he committed no offense at all. The State contends it presented ample evidence to support the convictions, and it is absurd to equate convictions of lesser included offenses with the notion a jury disbelieved the State's evidence.

Absent a contemporaneous objection to the giving of instructions on a responsive verdict, a defendant cannot complain if the jury returns a legislatively approved responsive verdict, even where there is insufficient evidence to support such a verdict, provided that the evidence is sufficient to support the charged offense. State v. Schrader, 518 So. 2d 1024, 1034 (La. 1988); State ex rel. Elaire v. Blackburn, 424 So. 2d 246, 252 (La. 1982), cert. denied, 461 U.S. 959, 103 S. Ct.

12

2432, 77 L. Ed. 2d 1318 (1983). In such a case, a jury has the right to "compromise" between the charged offense and a verdict of not guilty. Jurors may return a "compromise" verdict for whatever reason they deem to be fair, so long as the evidence is sufficient to sustain a conviction for the charged offense. State v. Miller, 2012-0581 (La. App. 1st Cir. 11/2/12), 2012 WL 5387681, at *4, writ denied sub nom., State ex rel. Miller v. State, 2012-2675 (La. 8/30/13), 120 So. 3d 256.

Here, defendant did not challenge the jury instructions given by the trial court at the beginning of deliberation, or when the court provided the definitions again upon the jury's request. Louisiana's system of responsive verdicts presupposes a jury's authority to compromise its verdict even in the face of overwhelming evidence of the charged crime. State v. Jones, 2018-0085 (La. App. 1st Cir. 11/5/18), 2018 WL 5785450, at *7, writ denied, 2018-1993 (La. 4/22/19), 268 So. 3d 294. Thus, this claim also lacks merit as there was sufficient evidence to support the charged offenses.

**CONVICTIONS AND SENTENCES AFFIRMED.**