619 So.2d 692 (1993)
STATE of Louisiana
v.
Thomas J. BROWN.
No. 92-KA-1492.
Court of Appeal of Louisiana, Fourth Circuit.
May 13, 1993.
*693 Harry F. Connick, Dist. Atty., Elizabeth Revere, Susan M. Erlanger, Asst. Dist. Attys., New Orleans, for appellee.
Ellen Widen Kessler, Marynell L. Piglia, Lowe, Stein, Hoffman, Allweiss & Hauver, New Orleans, for defendant.
Before KLEES, WARD and LANDRIEU, JJ.
LANDRIEU, Judge.
Thomas J. Brown was indicted by the grand jury on February 25, 1988 with two counts of first degree murder in violation of La.Rev.Stat.Ann. § 14:30 (West 1986). At his arraignment on February 29, 1988, he entered a dual plea of not guilty and not guilty by reason of insanity. After a four-day trial, a twelve-member jury on June 23, 1988 found the defendant guilty of manslaughter of Claudette McGowan on count one and guilty as charged of first degree murder of Leslie McGowan on count two. He was sentenced on July 12, 1988 to serve twenty-one years (21) at hard labor on count one and life imprisonment without the benefit of parole, probation, or suspension of sentence on count two; the sentences were to run concurrently.
After reviewing the record for errors patent only, this Court affirmed the defendant's convictions and sentences. State v. Thomas J. Brown, 552 So.2d 1064 (La.App. 4th Cir.1989). Because the appeal was not in compliance with the procedure required by Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), as interpreted in Lofton v. Whitley, 905 F.2d 885 (5th Cir.1990), the trial court on March 20, 1992 granted the defendant's application for post conviction relief and ordered an out-of-time appeal be granted. On appeal, defendant relies on three assignments of error for reversal of his convictions and sentences. We affirm.

FACTS
Ms. Claudette McGowan and her three children, Brandon, Brandy, and Leslie, lived in a third-floor apartment in the Fischer Housing Project, New Orleans. For more than a year, Ms. McGowan dated the defendant, *694 who was a frequent visitor to her apartment and often cared for her children. Several days before the victims' deaths, Ms. McGowan and the defendant were seen arguing and fighting. In the presence of Claudette Tassin, the defendant accused Ms. McGowan of stealing some money he recently received from the settlement of a lawsuit. When Ms. McGowan denied taking the money, defendant stated, "Yes, you took my money ... and if I want to do you anything, all I have to do is pick you up and throw you off the third floor." After the defendant made the statement, Ms. McGowan asked him, "You wouldn't hurt me would you, Thomas"? to which defendant replied, "No, I wouldn't kill you, but you stole my three hundred dollars."
On August 25, 1987 at approximately 8:30 p.m., several neighbors witnessed the defendant throw Ms. McGowan's three children from a third-floor balcony of the Fischer Housing Project. One of those children, Leslie McGowan, who was eight years old at the time, later died from injuries she sustained in the fall. Johnny Thornton discovered Ms. McGowan on the bedroom floor of her apartment suffering from multiple stab wounds, of which she later died. The bedroom was in total disarray as though a fight had occurred and a buck knife with blood on the blade was found on the washing machine. On his way to Ms. McGowan's apartment, Thornton had seen the defendant, who was nonresponsive and looked like he was high on drugs. After finding Ms. McGowan, Thornton ran to catch the defendant, who told Thornton that he was going to look for his friend Al.
At about the same time, Sterling Williams caught the defendant and asked him, "Man, what you supposed to be doing throwing the children downstairs like that?" to which the defendant stated "Yes, I killed them and I'm going by Al's." As Williams attempted to stop the defendant, Brown swung at him. In order to protect himself, Williams hit the defendant whereupon other people also began beating him. By the time the police arrived on the scene, the defendant was lying on the ground badly beaten; he was almost unconscious. Taken to Charity Hospital for treatment, he was released several hours later.
At Charity Hospital, the defendant was treated by Drs. John Jones and Charles Preston. When Dr. Jones asked the defendant how he obtained his injury, Brown replied he was beaten up. A mental status examination revealed the defendant was alert and oriented. He knew his name, the date, and that he was at Charity Hospital. The defendant told Dr. Jones that he had killed Claudette McGowan and hurt her children because they belonged to her. He further told Dr. Jones that he had not taken drugs that night.
While being treated by Dr. Preston, the defendant stated that "a kid put PCP in his Cool-Aid (sic), that he had stabbed her and threw the children off the balcony, that he killed her, that he killed them all." Considering defendant's cooperativeness and the lack of any physical findings, Dr. Preston felt it was unlikely someone put PCP in his Kool-Aid. No urinalysis was performed on the defendant although one was apparently ordered and the blood sample taken from him was not screened for narcotics.
From Charity Hospital, Detective Miller transported the defendant to his office. According to Detective Miller's testimony, at that time the defendant looked like he was under the influence of drugs or had been beaten, his speech was slurred, his eyes were glassy and cloudy, and his pupils were dilated. The defendant told Detective Miller that the children put something in his Kool-Aid.
Shortly after Ms. McGowan was discovered, Officer George Waguespack searched her apartment. There was no Kool-Aid in the refrigerator, and he did not smell PCP in the apartment. After the Crime Lab left the scene, Sylvia Joseph, Ms. McGowan's cousin, cleaned the apartment. No pitcher or jar which could have contained the Kool-Aid was found.
Drs. Aris Cox and Richard Richoux stated the defendant's conduct was consistent with phencyclidine (PCP) toxicity. Both doctors further claimed the defendant told them he did not recall anything from the *695 time he drank a pitcher of Kool-Aid until after he was beaten by the crowd. Because the defendant's urine was not tested at Charity Hospital, both doctors claimed it was impossible to determine whether the defendant was on PCP at the time of the crime. The defendant did not mention to Dr. Cox that he smoked a marijuana cigarette dipped in PCP ("click-um") on the night of the offenses.
At trial, the defendant testified that on the evening of the homicides, Ms. McGowan gave him a marijuana cigarette which caused him to begin to feel "funny" like "when PCP was slipped" on him. He then went into the kitchen and drank a jar of strawberry Kool-Aid which made him feel even stranger; the defendant remembered nothing more until he was in Orleans Parish Prison. Brown stated he did not use phencyclidine nor had he smoked "click-ums" with Ed Richardson several days prior to the killings. Furthermore, he denied that he argued with the victim.
On rebuttal, Dr. Robert Myles testified the defendant was admitted into DePaul Hospital on December 22, 1983 for drug abuse. At that time, the defendant stated to Dr. Myles that he used PCP on a daily basis for four years.
Ed Richardson rebutted the defendant's testimony that he had not smoked "click-ums" several days before the offenses. According to Richardson's testimony, he smoked "click-ums" with the defendant the previous Saturday. At that time, the defendant told Richardson he had purchased one-half bottle of "real good juice" (liquid PCP) and had given the remainder to his friend Al to sell.

DISCUSSION

ERRORS PATENT
A review of the record for errors patent reveals none.

ASSIGNMENT OF ERROR NUMBER 1
In his first assignment of error, the defendant contends the trial court committed reversible error when it admitted certain statements made to and testimony by Drs. Charles Preston and John Jones, the treating physicians at Charity Hospital. Prior to trial, the defense filed a motion to exclude the doctors' testimony based on the physician/patient privilege. After the trial court heard testimony and took the matter under advisement, it denied the motion.
The defendant's claim of privilege was based upon La.Rev.Stat.Ann. § 15:476 (West 1992) which states in pertinent part:
Except as provided in Subsection B[1], no physician is permitted, whether during or after the termination of his employment as such, unless with the patient's express consent, to disclose any communication made to him as such physician by or on behalf of his patient, or the result of any investigation made into the patient's physical or mental condition, or any opinion based upon such investigation, or any information that he may have gotten by reason of his being such physician. The provisions of this Section shall not apply to any physician, who, under the appointment of the court, and not by a selection of the patient, has made investigation into the patient's physical or mental condition; in addition, any physician may be cross-examined upon the correctness of any certificate issued by him.
An implied waiver of the physician/patient privilege exists in cases where the defendant enters a plea of not guilty by reason of insanity. State v. Berry, 324 So.2d 822 (La.1975) cert. denied 425 U.S. 954, 96 S.Ct. 1731, 48 L.Ed.2d 198 (1976). In Berry, 324 So.2d at 827-28, the Court stated:
By tendering his mental condition to the jury, [the defendant] waived his right to claim the privilege as to other psychiatric medical evidence relevant to determination of the issue, such as (in this instance) prior medical examination and diagnosis as to the mental condition he now claims exonerates him from criminal responsibility. By claiming, the benefits *696 of his plea of insanity, he cannot offer that from the past or present which is favorable to his contention, but at the same time withhold from the jury's consideration (if the state offers it) that which is unfavorable to his plea. [Citation omitted].
The defendant argues the narrow waiver set forth in Berry does not apply because the treating physicians were not psychiatrists, had not been appointed as part of a lunacy commission, and were not testifying about the defendant's mental condition, but instead testified about the defendant's physical condition and inculpatory statements he made.
The State, on the other hand, argues jurisprudence subsequent to Berry refutes the concept that Berry is limited to psychiatric testimony pursuant to a lunacy commission. In State v. Aucoin, 362 So.2d 503, 505 (La.1978), the Court noted:
... the rationale for the implied waiver in Berry was not the status of the particular doctors, but the defendant's tender of his mental state as an issue in the trial. The only limitation there announced is that, by tendering his mental health as an issue, the defendant waives the privilege only as to such information as is genuinely relevant to the narrow issue there tendered, provided also that its probative value outweighs its prejudicial effect. 324 So.2d [at] 828. [Emphasis added]
Footnote omitted.
See also, State v. Brogdon, 457 So.2d 616 (La.1984) cert. denied 471 U.S. 1111, 105 S.Ct. 2345, 85 L.Ed.2d 862 (1985).
In the instant case, the defendant entered a plea of not guilty by reason of insanity. The alleged cause of the "insanity" was phencyclidine-induced psychosis, not ongoing mental illness. By entering this plea and making this defense, the defendant tendered the issue of his mental and (drugged) physical condition. Therefore, the physicians' testimony regarding the defendant's mental and physical condition at the time of the crime (conditions that are not going to be present at the time of subsequent psychiatric evaluations) is "genuinely relevant to the narrow issue" tendered to the jury.
Furthermore, admission of the inculpatory statements made by the defendant, insofar as they tended to prove he committed the physical acts which caused the victims' deaths, was not reversible error. There was ample other evidence to establish that the defendant stabbed Claudette McGowan and threw Leslie McGowan over the third-floor balcony, including an inculpatory statement made at the scene to Sterling Williams. Thus, the probative value of the statements, as they tended to show the defendant's awareness and mental condition at the time of the offense, was not outweighed by its prejudicial effect. Accordingly, this assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER 2
Defendant contends that the jury's verdicts were both against the weight of the evidence and inconsistent. Specifically, he argues, because the jury returned a verdict of manslaughter[2] on the count involving Claudette McGowan, it must have *697 found the defendant acted in the heat of passion when he killed her. Therefore, there was insufficient time for the defendant's blood to cool before he killed the second victim, Leslie McGowan.
When evaluating the sufficiency of evidence to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Jacobs, 504 So.2d 817 (La.1987).
Section 14:30 defines first degree murder, in pertinent part, as follows:
A. First degree murder is the killing of a human being:
. . . . .
(3) When the offender has specific intent to kill or to inflict great bodily harm upon more than one person;
. . . . .
(5) When the offender has the specific intent to kill or to inflict great bodily harm upon a victim under the age of twelve years.

. . . . .
Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La.Rev.Stat. Ann. § 14:10(1) (West 1986).
Manslaughter is a responsive verdict to the charge of first degree murder. In State v. Schrader, 518 So.2d 1024 (La. 1988), (quoting from State v. Camp, 571 So.2d 195, 200 (La.App. 4th Cir.1990), the Court noted:
The appellate court was correct insofar as it held that, absent a contemporary objection, a defendant may not complain if jurors return with a legislatively approved responsive verdict, whether or not that verdict is supported by the evidence. This Court has indicated that such a result both recognizes the legitimacy of a "compromise" verdict and comports with the responsive verdict scheme of La.C.Cr.P. art. 814. State ex rel. Elaire v. Blackburn, 424 So.2d 246 (La.1982). However, and as Elaire made clear, there is an important proviso to this rule: the evidence must be sufficient to sustain a conviction on the charged offense. Id. at 251.
The defendant was charged with committing the first degree murder of Claudette McGowan while attempting to kill or inflict great bodily harm upon more than one person under § 14:30(A)(3). The multiple stab wounds Ms. McGowan suffered were sufficient to show an intent to inflict great bodily harm. Furthermore, there was overwhelming evidence that the defendant threw Ms. McGowan's children from a third-floor balcony.
There was also ample evidence to support the verdict of first degree murder of Leslie McGowan. Carole Bedell, the child's aunt, testified that Leslie was eight years old when she died, thus establishing the aggravating factor required under § 14:30. Moreover, after the defendant had thrown her two younger siblings over the balcony, he threw Leslie over a third-floor balcony.
Witnesses testified that the defendant threw the first child, walked inside, came out, threw the second child over the balcony, walked inside again, came out with Leslie McGowan, then threw her over. Between the time that the first and second child were thrown, Belinda Roberts had time to reach the baby. Clearly, the evidence of these witnesses indicated that the defendant acted deliberately, not in the heat of passion, and that there was sufficient time for the defendant's blood to have cooled after his (possible) fight with Claudette McGowan.
Viewing the evidence in the light most favorable to the prosecution, we find sufficient evidence for the jury to have concluded that the defendant intended to kill or to inflict great bodily harm upon both Ms. McGowan and her daughter Leslie. Accordingly, this assignment of error is without merit.

*698 ASSIGNMENT OF ERROR NUMBER 3
In his last assignment of error, defendant contends there was sufficient evidence to show the involuntary intoxication of the defendant which negated the existence of specific intent and supported a verdict of not guilty by reason of insanity.
The intoxication defense is recognized in La.Rev.Stat.Ann. § 14:15 (West 1986), which states:
The fact of an intoxicated or drugged condition of the offender at the time of the commission of the crime is immaterial, except as follows:
(1) Where the production of the intoxicated or drugged condition has been involuntary, and the circumstances indicate this condition is the direct cause of the commission of the crime, the offender is exempt from criminal responsibility.
(2) Where the circumstances indicate that an intoxicated or drugged condition has precluded the presence of a specific criminal intent or of special knowledge required in a particular crime, this fact constitutes a defense to a prosecution for that crime.
Under Louisiana law, a presumption exists that a criminal defendant is sane and responsible for his actions. La.Rev.Stat. Ann. § 15:432 (West 1992). Therefore, the defendant has the burden of proving his insanity by a preponderance of the evidence. La.Code Crim.Proc.Ann. art. 652 (West 1981); State v. Claibon, 395 So.2d 770 (La.1981); State v. Martin, 550 So.2d 568 (La.1989).
In the instant case, the only direct evidence to show that the defendant was intoxicated on PCP at the time of the offense was his own testimony that he had smoked a marijuana cigarette that made him feel "funny", the same way as he had felt when he took PCP previously, and that he felt worse and remembered nothing after he drank Kool-Aid. There was no physical, direct evidence to support his claim. The apartment did not have an odor associated with PCP according to the investigating officer; two witnesses testified that there was no bottle or pitcher containing or which could have contained Kool-Aid. Furthermore, the defendant denied that he used PCP; that testimony was contradicted by that of Ed Richardson and by testimony from Dr. Myles about the defendant's history of PCP abuse.
The only circumstantial evidence to support the defendant's claim that he was intoxicated on PCP came from descriptions of the defendant's behavior and physical appearance. While there was expert testimony from Drs. Cox and Richoux that the defendant's reported behavior was consistent with PCP toxicity, Dr. Cox testified that he had never seen a person lose memory for an extended period of time, as the defendant claimed. Furthermore, Dr. Doris LeBlanc, an expert in psychiatry and toxic psychosis, stated that the defendant related to her that he had a history of PCP use, but it was her opinion that the defendant's alleged amnesia about the killings was "manipulation on his part".
In addition to the conflicting testimony about the possibility that the defendant actually had experienced amnesia from the use of phencyclidine, and whether it was consistent with such usage, there was evidence that the defendant and victim had argued before the final incident which resulted in the deaths. The defendant had made references to throwing Claudette McGowan off the third floor. Such evidence of prior threats would tend to negate the defendant's argument that he was incapable of forming the specific intent to cause great bodily harm.
After reviewing the record, it was not unreasonable for the trier of fact to conclude that Brown had the required specific intent at the time he committed these offenses. Accordingly, this assignment of error is without merit.
For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.
NOTES
[1] Subsection B pertains to admission of tests on bodily substances and foreign objects and is not applicable to the defendant's claim of privilege.
[2] La.Rev.Stat.Ann. § 14:31 (West 1986) defines manslaughter as:

(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or
(2) A homicide committed, without any intent to cause death or great bodily harm.
(a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Articles 30 or 30.1, or of any intentional misdemeanor directly affecting the person; or
(b) When the offender is resisting lawful arrest by means, or in a manner, not inherently dangerous, and the circumstances are such that the killing would not be murder under Articles 30 or 30.1.