STATE OF LOUISIANA      *      NO. 2023-KA-0584

VERSUS      *

     COURT OF APPEAL

ERNEST M. RICHARDSON      *

     FOURTH CIRCUIT

     *

     STATE OF LOUISIANA

     * * * * * * *

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 541-783, SECTION "G"
Judge Nandi Campbell
* * * * * *
**Chief Judge Terri F. Love**
* * * * * *

(Court composed of Chief Judge Terri F. Love, Judge Roland L. Belsome, Judge Dale N. Atkins)

Holli Herrle-Castillo
LOUISIANA APPELLATE PROJECT
P. O. Box 2333
Marrero, LA 70073-2333

     COUNSEL FOR APPELLANT

Jason Rogers Williams
District Attorney, Orleans Parish
Brad Scott
Chief of Appeals
Patricia Amos
Assistant District Attorney
619 S. White Street
New Orleans, LA 70119

     COUNSEL FOR APPELLEE

         **CONVICTONS AND SENTENCES AFFIRMED**
           **April 25, 2024**

*TFL*

*RLB*

*DNA*

Defendant, Ernest Richardson, appeals his convictions for attempted manslaughter, simple kidnapping of a minor, K.L.,[1] and obstruction of justice arising from a second degree murder investigation. In the underlying trial, Defendant was found not guilty by reason of insanity of second degree murder. On appeal, Defendant argues that the evidence was insufficient to support his convictions for the attempted manslaughter of K.L. and obstruction of justice.[2] Defendant maintains that the State failed to prove his intent to kill or cause great bodily harm to K.L. or the intent to obstruct justice. Defendant also avers that the jury's finding of not guilty by reason of insanity of second degree murder—which allegedly occurred within the same time frame as the attack against K.L.—meant he was likewise not guilty by reason of insanity for his offenses against K.L.

Viewing the evidence in the light most favorable to the State, a rational trier of fact could have found Defendant guilty of attempted manslaughter and

---

[1] The juvenile will be referenced by her initials in order to ensure her confidentiality. *See* La. Ch.C. art. 412. *See also* Rule 5-2, Uniform Rules-Courts of Appeal.

[2] Defendant does not seek appellate review of the simple kidnapping conviction.

obstruction of justice. Accordingly, Defendant's convictions and sentences are affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant was charged by bill of indictment with one count of second degree murder, a violation of La. R.S. 14:30.1, involving the shooting death of his grandmother, Beverly Wilkerson ("the victim"), and attempted second degree murder and aggravated kidnapping of a minor, K.L., respective violations of La. R.S. 14:(27)30.1 and La. R.S. 14:44.2. Defendant was also charged with obstruction of justice involving the second degree murder offense, in violation of La. R.S. 14:130.1. Defendant pled not guilty to the charges.

Initially, Defendant was found incompetent to stand trial and was remanded to East Louisiana Mental Health Facility in Jackson, Louisiana. Following treatment and additional hearings, Defendant was found competent to proceed to trial. At pre-trial, the trial court granted in part and denied in part Defendant's motion to suppress his statements. Upon re-arraignment, Defendant changed his plea from not guilty to not guilty/not guilty by reason of insanity.

### *Trial Testimony*

Testimony at trial included the following:

<u>Tyrell Morris</u>

Mr. Morris, the executive director of the Orleans Parish Communications District, the entity responsible for answering and processing 911 calls, verified receipt of a 911 call wherein an individual called from a church to request police assistance. The State introduced the call into evidence and published the call to the jury. The caller believed a homicide had taken place at 10220 Brookfield and

2

requested that the police go to that address. The caller explained that she was in church when her cousin entered and announced that he had shot the victim—his grandmother. The caller relayed that her cousin was still at the church.

Sergeant Michael Hamilton

Sergeant Hamilton testified that he was dispatched to the address on Brookfield Drive. Upon entering the residence, he was advised that "a body wrapped in plastic with . . . a large rug on top" had been found.

Dr. Samantha Huber

The parties stipulated that Dr. Huber, the chief forensic pathologist for Orleans Parish, was an expert in forensic pathology. Dr. Huber relayed that pictures taken at the scene showed the victim had been wrapped in comforters and plastic. Dr. Huber testified that the victim's cause of death was a gunshot wound to the head, which was classified as a homicide.

Yvette Rivarde

Ms. Rivarde testified that Defendant was her second cousin. She said that she was at church when Defendant arrived and loudly stated that he was "looking for his momma," also known as his "Auntie Sandra." Because Defendant was being disruptive, Ms. Rivarde went outside with Defendant and told him that his Auntie Sandra was not at church. Upon hearing this, Defendant admitted that he had done "something bad" and "he kept on asking for Sandra." Pursuant to Ms. Rivarde's inquiries, Defendant repeatedly told her that he had shot Beverly, the victim, and was "going to go to jail for life." Ms. Rivarde called family members and placed a 911 call after learning what Defendant had done.

Following the 911 call, Ms. Rivarde said Defendant started pacing and seemed nervous. Ms. Rivarde tried to calm Defendant so that he would not leave

the scene. Thereafter, Ms. Rivarde observed Defendant retrieve a gun from a garbage can and drive away in the victim's vehicle. Ms. Rivarde said that Defendant returned approximately two minutes later; however, she no longer saw a gun in his possession. Ms. Rivarde stated that she had never thought of Defendant as a person with a mental disease during the time that she has known him.

Detective Sergeant Clinton Givens

Detective Sergeant Givens led the investigation into the murder of the victim. After entering the residence, Detective Sergeant Givens testified that he saw a body wrapped in plastic and blood stains on the floor, a pillow, and possibly on the wall. While numerous items were recovered at the scene, Detective Sergeant Givens said that neither the murder weapon nor any shell casings were found.

As part of his investigation, Detective Sergeant Givens learned of a second victim, K.L. K.L.'s mother reported that Defendant had choked K.L. on the day of the shooting. Physical evidence supported that K.L. had bruises to her neck and face. Because of K.L.'s age, eight years old, an interview was scheduled for her at the Child Advocacy Center ("CAC").

K.L.'s Audio and Video CAC Recording

The CAC's audio and video recorded interview with K.L. was introduced into evidence and published to the jury. In the recorded interview, K.L. stated that Defendant grabbed her by her arm, brought her upstairs, and started "smothering" her. She explained that Defendant put his hand over her nose and her mouth, causing bruising on her face. Shortly thereafter, he let her go and she ran downstairs. Later, Defendant grabbed her by the leg and started to choke her with both of his hands. She explained that she could not talk, could not breathe, and

4

started to cough. As a result of the choking, K.L. suffered bruises on her neck. K.L. stated that Defendant was choking K.L. while the victim was asleep on the couch.

K.L. maintained that after Defendant choked her, he "put me in a black truck with some man and I didn't know his name . . . and he told that man to kidnap me and bring me back to Texas;" instead, however, the man brought her to her Auntie Dana's house. K.L. stated that she did not witness Defendant shoot the victim. K.L. explained that she only learned that Defendant had shot the victim when she "heard about it on the news," after she was at her aunt's house.

Dr. Neha Mehta

Dr. Mehta, an expert in child abuse pediatrics and the medical director of the Audrey Hepburn Care Center, examined K.L. She testified that her examination revealed bruising to the lower left side of K.L.'s face. There was also bruising on the lower left aspect, middle, and the middle right hand side of K.L.'s neck. K.L. told Dr. Mehta that Defendant had choked her.

Detective Leonard Bendy[3]

Detective Bendy interviewed Defendant while the on-scene investigation was ongoing. Detective Bendy testified that he read Defendant his *Miranda* rights and subsequent thereto, Defendant elected to speak with him. His audio and video recorded interview with Defendant was introduced into evidence and published to the jury.

---

[3] Prior to Detective Bendy's testimony, Rici. Rawls, a field service technician, also testified regarding the procedures to record the telephone calls of Orleans Parish incarcerated inmates.

Defendant's Recorded Interview with Detective Bendy

The recorded interview confirmed that Detective Bendy advised Defendant of his *Miranda* rights and verified that Defendant consented to speak with Detective Bendy. Defendant repeatedly cried during the interview and some of his statements were not audible. Defendant asked to speak with Sandra Wilkerson, his great aunt, but could not provide Detective Bendy with her telephone number. When asked the last time he had seen the victim, Defendant responded, "[a]in't no telling." Defendant explained that he did not see the victim because she "ain't no good" and she never cared about him. Defendant then spoke unintelligibly about unrelated matters, spat on the floor, cried, and mumbled incoherently. Around this time, Detective Bendy left the interrogation room to attempt contact with Defendant's mother, Dana Wilkerson, at a number provided by Defendant.

Upon Detective Bendy's return to the interrogation room, Defendant told Detective Bendy that he had driven to the church in the victim's vehicle. Defendant said he did not know how he acquired the vehicle and claimed he did not know what happened to the victim. Nonetheless, Defendant was able to identify the victim as his grandmother and Dana Wilkerson as his mother. Defendant told Detective Bendy that nobody, including the victim, treated him well.

Defendant admitted to owning firearms; however, he said there were no firearms in the victim's vehicle. Defendant stated that he kept one of his guns in the back of his truck and his other weapon was stolen. Thereafter, Defendant stated that he dreamed about killing people, specifically, K.L.'s mother and the victim. Defendant went on a diatribe when Detective Bendy again asked how he acquired the victim's vehicle. Defendant again vehemently insisted that he did not

know what happened and refused to provide any explanation as to how he acquired the victim's vehicle. Defendant responded "no" when again asked if he had recently shot a gun.

After Detective Bendy again left the interrogation room to attempt contact with Defendant's family, Defendant resumed crying and repeatedly stated that he wanted his Auntie Sandra. Detective Bendy returned and told Defendant that he would continue efforts to contact the aunt.

Officer Kenneth Leary

Officer Leary, an expert in criminology and firearms examination, testified that a projectile recovered from the victim's autopsy was "consistent with a 40 caliber class ammunition which includes 30 SNW ammunition." On cross-examination, Officer Leary explained that the projectile was a 40-caliber Smith & Wesson.

Detective Eddie Williams

Detective Williams stated that he performed a "search history" of Defendant's cell phone from March 10, 2018, starting at approximately 1:57 a.m. to 10:10 a.m. He testified the search revealed that there were multiple queries— between sixty to eighty—on how to disable the GPS on a 2017 and 2015 Silverado, models similar to the victim's vehicle.

The State rested its case following Detective Williams' testimony and the defense called the following witnesses.

Breanna Richardson

Ms. Richardson testified that Defendant was her older brother. She stated that they briefly lived together when they were children with the victim and their aunt, Kelly Wilkerson ("Aunt Kelly"). She described their "living conditions" as

"hell," stating that she and Defendant were "nothing" to the victim and Aunt Kelly. She asserted: "it's been horrible our whole life until we was [sic] able to, I guess, make it out on our own . . . ." Ms. Richardson explained that she and defendant were physically, verbally, and sexually abused. The abuse included having to perform sex acts on each other and watching adults engage in sexual relations.

Dana Wilkerson

Ms. Wilkerson testified that Defendant was her son and the victim was her mother. She stated that she was emotionally and physically abused by both her mother and father. She also stated that the abuse she suffered adversely affected how she treated her children.

Ms. Wilkerson advised that Defendant was only four years old when she started using drugs. Her drug use made him sad and Defendant threatened to run away. Defendant was eventually sent to live with the victim; however, the victim could not handle Defendant, so he lived "back and forth" between the victim and his great Aunt Sandra. She specified that Aunt Kelly called Defendant stupid, fat, and would beat him.

Dr. Richard Turner

Dr. Turner was a member of the Sanity Commission. He testified concerning his evaluation of Defendant on March 21, 2019. Dr. Turner advised that Defendant was prescribed Seroquel, 300 milligrams, an anti-psychotic medication which is used as a mood stabilizer and sometimes for sedation or sleep assistance in patients who have various mental illnesses.

On cross-examination, Dr. Turner confirmed that the March 21, 2019 report on Defendant was a competency evaluation. He agreed that a competency evaluation differs from an evaluation to determine sanity at the time of the offense.

8

He explained that a competency evaluation hinges on two findings: whether the defendant has an understanding of the legal proceedings against him and whether the defendant is capable of helping his attorneys in his own defense. Initially, in the March 21, 2019 competency report, Defendant was found to be incompetent. The basis of that finding was Defendant's depression. Dr. Turner explained that notwithstanding Defendant's medication, he did not diagnose Defendant as psychotic. Dr. Turner stated that Defendant's primary diagnosis was "major depressive disorder."

Dr. Turner reiterated that Defendant underwent a competency evaluation; Defendant was never evaluated as to whether Defendant was insane when he committed the offenses.

### *Jury Verdict/Sentencing*

At the conclusion of the trial, the jury returned a verdict of not guilty by reason of insanity with respect to the second degree murder of the victim; guilty of attempted manslaughter of K.L.; guilty of simple kidnapping; and guilty as charged to obstruction of justice in connection with the second degree murder investigation.

The trial court denied Defendant's motion for new trial. After the appropriate delay, the trial court sentenced Defendant as follows:

> [A]s it relates to the attempted manslaughter charge, I'm going to sentence you to five years['] [imprisonment] in [the Louisiana Department of Corrections ["DOC"] with credit for time served without the benefit of probation, parole, and suspended sentence.
>
> As it relates to obstruction of justice, I'm going to sentence you to 20 years['] [imprisonment], DOC, with credit for time served.
>
> As it relates to simple kidnapping, I'm going to sentence you to five years['] [imprisonment], DOC, with credit for time served.
>
> All sentences to run concurrent with each other.

9

This appeal followed.

## DISCUSSION

Defendant's sole assignment of error asserts the evidence was insufficient to support his convictions for attempted manslaughter of K.L. and obstruction of justice. As to the manslaughter conviction, Defendant maintains the State failed to prove he "intended to kill or cause great bodily harm to K.L." Defendant also claims that the jury's finding of not guilty by reason of insanity for the victim's murder should also apply to set aside his attempted manslaughter conviction relative to K.L. as both events "occurred in the same time frame." With reference to the obstruction of justice conviction, Defendant similarly urges that the conviction was not warranted based on the State's alleged failure to prove that he had the requisite specific intent to distort the result of a criminal proceeding.

**Standard of Review**

The United States Supreme Court provided the standard of review for a claim of insufficiency of the evidence in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (citation omitted and footnote omitted):

> …the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution [emphasis in original].

The *Jackson v. Virginia* standard of review also applies to the affirmative defense of insanity in that the trial court "must determine whether under the facts and circumstances of the case, any rational fact finder, viewing the evidence most favorable to the prosecution, could conclude, beyond a reasonable doubt, that the defendant failed to prove by a preponderance of the evidence that he was insane at the time of the offense." *See State v. Silman*, 1995-0154, p. 7 (La. 11/27/95), 663 So.2d 27, 32 (citations omitted).

We begin our review by considering the sufficiency of the evidence to convict Defendant of the attempted manslaughter of K.L.

### *Attempted Manslaughter*

The State charged Defendant with attempted second degree murder of K.L., however, the jury convicted him of the responsive verdict of attempted manslaughter. Second degree murder, as defined in La. R.S. 14:30.1(A)(1), includes, in pertinent part, the killing of another "[w]hen the offender has the specific intent to kill or inflict great bodily harm." An attempt occurs when the perpetrator "having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object." *See* La. R.S. 14:27(A). Although second degree murder requires the intent either to kill *or* inflict great bodily harm, attempted second degree murder mandates an intent to kill. *See State v. Bishop,* 2001-2548, p. 4 (La. 1/14/03), 835 So.2d 434, 437.

Here, the jury found Defendant guilty of attempted manslaughter. Pursuant to La. R.S. 14:31(A)(1), manslaughter is defined, in pertinent part, as "[a] homicide which would be murder under . . . Article 30 .1(second degree murder), but the offense is committed in sudden passion or heat of blood immediately

11

caused by provocation sufficient to deprive an average person of his self-control and cool reflection." Specific intent is defined by La. R.S. 14:10(1) as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." Specific intent "may be inferred from the defendant's actions and the circumstances of the transaction." *State v. Brown*, 2003-0897, p. 22 (La. 4/12/05), 907 So.2d 1, 18.

Defendant argues herein that the evidence was insufficient to support his attempted manslaughter conviction because although he smothered and later choked K.L., in both instances, he released K.L. and later "removed her from the house and sent her away." Defendant surmises that K.L., an eight-year-old, was "no match" for Defendant; and as such, if he had "intended to kill her, he could easily have succeeded by shooting her." We find these arguments unpersuasive.

The fact that Defendant could have, but did not, use his gun to shoot K.L., does not mandate a finding that the evidence was insufficient to convict for attempted manslaughter. As noted in *Brown,* 2003-0897, p. 22, 907 So.2d at 18, the circumstances surrounding a defendant's actions are sufficient to infer specific intent. The record shows that Defendant smothered and choked K.L. multiple times. The fact that Defendant may have ultimately released K.L. does not absolve Defendant of his guilt for attempted manslaughter during the time(s) he, in fact, smothered and choked the minor child. Therefore, the evidence was sufficient for a rational finder to find that Defendant intended to kill K.L. and consequently, supports the jury's verdict of attempted manslaughter.

Defendant also argues that the jury's attempted manslaughter verdict cannot stand because he was found not guilty by reason of insanity for the victim's

murder, a murder which Defendant contends happened within "a few seconds" of his attacks on K.L. Defendant asserts that it is difficult to ascertain how he could have been found insane when he shot the victim, yet not insane when he attempted to kill K.L.

In Louisiana, a defendant is presumed sane. *See* La. R.S. 15:432.[4] The State has no legal burden to prove sanity. *See State v. Claibon,* 395 So.2d 770, 772 (La. 1981). Instead, "[t]he defendant has the burden of establishing the defense of insanity at the time of the offense by a preponderance of the evidence." La. C.Cr.P. art. 652. *See also State v. Brown*, 619 So.2d 692, 698 (La. App. 4th Cir. 1993) (reiterating that "[u]nder Louisiana law, a presumption exists that a criminal defendant is sane and responsible for his actions."). "Legal insanity in Louisiana means that a defendant has a mental disease or defect which prevents him from distinguishing right from wrong with reference to the conduct which forms the basis for the criminal charge against him." *Claibon,* 395 So.2d at 772 (citing La. R.S. 14:14).

---

[4] La. R.S. 15:432 provides the following:

> A legal presumption relieves him in whose favor it exists from the necessity of any proof; but may none the less be destroyed by rebutting evidence; such is the presumption attaching to the regularity of judicial proceedings; that the grand jury was legally constituted; that public officers have done their duty; that a relation or subject-matter once established, continues, but not that it pre-existed; that the defendant intended the natural and probable consequence of his act; that the defendant is innocent; that the defendant is sane and responsible for his actions; that the person in the unexplained possession of property recently stolen is the thief; that evidence under the control of a party and not produced by him was not produced because it would not have aided him; that the witnesses have told the truth.

In the matter *sub judice*, notwithstanding the jury's finding that Defendant was not guilty by reason of insanity for the second degree murder of the victim, the transcript is devoid of evidence as to whether Defendant had a diagnosed mental disease or defect which prohibited Defendant from distinguishing between right and wrong at the time of his offenses against K.L. The only expert trial testimony regarding Defendant's mental status was provided by Dr. Turner. Dr. Turner, a member of the Sanity Commission, who evaluated Defendant on March 21, 2019, determined that Defendant was incompetent to proceed to trial at that time because of depression. Dr. Turner was never asked to evaluate Defendant's sanity at the time of either offense and did not render an opinion on same. Thus, given the absence of affirmative evidence the defense provided to support a finding of not guilty by reason of insanity at the time of the offenses against K.L., we decline to find that the not guilty by reason of insanity verdict on the second degree murder charge precluded a finding that Defendant was sane at the time of his attempted manslaughter of K.L.

Moreover, we find Defendant's assertion that the victim's murder and the attempted manslaughter of K.L. occurred "a few seconds" apart lacks a factual basis. K.L.'s CAC interview established that she did not witness the shooting. K.L. stated that Defendant brought her upstairs and smothered her by placing his hand over her nose and mouth, resulting in bruises on her face. After she momentarily escaped and returned downstairs, Defendant choked and caused bruising to K.L.'s neck. During this time, the victim was still alive—asleep on the couch. Defendant returned to the inside of the house and at some point thereafter, killed the victim. The killing happened only after he had placed K.L. in a car, with instructions that she be taken to Texas. Therefore, the actual time that lapsed

between Defendant's attack on K.L. and the shooting of the victim is uncertain. Nevertheless, the known evidence establishes that the two incidents did not occur within "a few seconds" of each other.

Hence, upon review of the evidence in its totality, Defendant's argument that the evidence was insufficient to convict of attempted manslaughter is not meritorious.

**Obstruction of Justice**

In this error, Defendant alleges that the State "failed to prove that [his] specific intent was to distort the results of a criminal investigation or proceeding."

Louisiana Revised Statute 14:130.1 defines obstruction of justice, in pertinent part, as follows:

A. The crime of obstruction of justice is any of the following when committed with the knowledge that such act has, reasonably may, or will affect an actual or potential present, past, or future criminal proceeding as described in this Section:

(1) Tampering with evidence with the specific intent of distorting the results of any criminal investigation or proceeding which may reasonably prove relevant to a criminal investigation or proceeding.

The statute further provides that "[t]ampering with evidence shall include the intentional alteration, movement, removal, or addition of any object or substance… [a]t the location of any incident which the perpetrator knows or has good reason to believe will be the subject of any investigation by state, local, or United States law enforcement officers." *See* La. R.S. 14:130.1(A)(1)(a). The specific intent to commit obstruction of justice does not need to be proven as a fact; instead, specific intent may be inferred from the defendant's actions and the circumstances. *State v. Bethley,* 2022-0849, pp. 9-10 (La. App. 4 Cir. 6/21/23), 368 So.3d 1148, 1156, *writ denied,* 2023-00965 (La. 1/17/24), ___ So.3d ___, 2024 WL 177385 (quoting *State*

15

*v. Harvey,* 2021-0730, p. 10 (La. App. 4 Cir. 5/25/22), 345 So.3d 1043, 1050, *writ denied,* 2022-00953 (La. 9/20/22), 346 So.3d 803).

A review of Ms. Rivarde's testimony supports that Defendant retrieved a gun from the church's garbage and fled the scene after Ms. Rivarde, while in Defendant's presence, had called 911 to report the murder and asked the police to come to the church. When Defendant returned, he did not have the gun in his possession and the gun was never recovered. In *Bethley,* 2022-0849, p. 10, 368 So.3d at 1148, this Court determined that the evidence was sufficient to support an obstruction of justice conviction where the jury could reasonably infer that the defendant left the scene with the firearm that he knew would be the subject of a criminal investigation. Similarly, the evidence herein supports that Defendant knew that police officers were on their way to investigate the victim's killing—a crime to which he had confessed to Ms. Rivarde. Accordingly, the jury could logically conclude that Defendant knew law enforcement would investigate the gun's role in the victim's killing. Under these circumstances, in viewing Defendant's actions in a light most favorable to the prosecution, the State proved the essential elements to uphold the jury's finding that Defendant obstructed justice, specifically, Defendant tampered with evidence with the specific intent of distorting the results of the pertinent criminal investigation. Accordingly, this assigned error lacks merit.

## DECREE

Based on the foregoing reasons, the evidence was sufficient to support Defendant's convictions for attempted manslaughter, simple kidnapping, and obstruction of justice. Accordingly, we affirm the judgment.

**CONVICTIONS AND SENTENCES AFFIRMED**

16